**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>STONE PINE INVESTMENT BANKING, LLC,<br><br>    Debtor. | Case No. 10-37635 KHT<br><br>Chapter 7 |
| DAVID E. LEWIS, as Chapter 7 Trustee for STONE PINE INVESTMENT BANKING, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>JACK TAKACS; PAUL BAGLEY; DONALD JACKSON; HLSP INVESTMENT BANKING, LLC; HLPEF/SP MANAGEMENT, LLC; THE STONE PINE COMPANY; PRINCETON PARTNERS, and AMERICAN NATIONAL SECURITY MANAGEMENT, LP,<br><br>    Defendants. | Adversary No. 12-01680 KHT |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER came before the Court for trial on Plaintiff's Complaint. Following the presentation of evidence and argument, and the submission of written closing arguments, the Court took the matter under advisement. The Court is now prepared to rule, and hereby finds and concludes as follows:

## I. JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding within 28 U.S.C. § 157(b)(2)(H) and (O). Venue is proper in this district under 28 U.S.C. § 1409. All parties consent to entry of final orders

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

or judgments by the Bankruptcy Court in this matter.  See Joint Status Report, Docket #46.


## II.    FACTUAL BACKGROUND

### A.    Paul Bagley, Stone Pine Capital, LLC and Princeton Partners.

In January 1994, Paul Bagley ("Bagley"), who had a Harvard MBA and 20 years' experience in investment banking at E.F. Hutton and Shearson Lehman, formed Stone Pine Capital, LLC, in Denver, Colorado.  Bagley also formed Princeton Partners, a general partnership owned by Bagley and his wife.

Bagley and his business partners[1] conducted investment banking and asset management activities through entities collectively referred to as the "Stone Pine Companies."  Bagley testified the name was almost like a trademark, referring to a set of companies involved with him, which expanded and contracted over 20 years but included a large number of entities.  The entities used common letterhead identifying their common office in Denver, Colorado, which from 1994 to 1997 was located at 410 Seventeenth Street, Suite 400, Denver, CO 80202.  The Stone Pine Companies used common business cards and a common domain name, thestonepinecompanies.com, for their website presence and email addresses.

### B.    Stone Pine Investment Banking, Stone Pine Asset Management, and Stone Pine Accounting Services.

In 1997/1998, the business of the Stone Pine Companies was reorganized into three entities:  Stone Pine Investment Banking ("SPIB"), which was to focus primarily on traditional investment banking opportunities; Stone Pine Asset Management ("SPAM"), which was to focus primarily on private equity management opportunities; and Stone Pine Administrative Services, which later became Stone Pine Accounting Services ("SPAS").

SPIB, successor to Stone Pine Capital, LLC, ultimately became the Debtor in the instant underlying bankruptcy case.

SPAM began working with Hamilton Lane, then the largest ERISA fund manager in the United States, to develop private equity management opportunities outside the United States.  Ultimately SPAM's management team left the company and went to work for Hamilton Lane.  SPAM changed its name to HLPEF/SP Management and became a passive entity holding an interest in European funds formed by Hamilton Lane.

SPAS was owned by CPA Donald Jackson ("Jackson"), who had previously worked for Bagley at E.F. Hutton.  SPAS performed administrative accounting services, maintained business records, and acted as common paymaster for the various entities comprising the Stone Pine Companies.  SPAS prepared income tax returns for SPIB from

---

[1] Bagley's original business partners are not Defendants in this proceeding.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

January 1, 2000, through the filing of SPIB's bankruptcy case.  SPAS also prepared SPIB's annual financial statements, in conjunction with the preparation of the tax returns. SPAS generated annual financial statements for SPIB until calendar year 2006, when it began preparing monthly summaries or statements for "litigation support."

### C.   Jack Takacs and Matisse Capital Partners.

Jack Takacs ("Takacs") was hired to work on transactions already in place and to originate new business opportunities.  He used business cards identifying him as a Managing Director of the Stone Pine Companies.  When Pacific USA Holdings, which had an existing relationship with one of the Stone Pine entities, had a need for restructuring services, Matisse Capital Partners ("Matisse") was formed to provide those services to Pacific USA and others.  Takacs was Matisse's initial manager and Jackson its Chief Financial Officer.  Matisse became a wholly owned subsidiary of SPIB.

In 1998, Matisse and Pacific USA entered into an agreement pursuant to which Takacs became a financial consultant and advisor with Pacific USA, eventually becoming CEO of Pacific USA.  Acting on behalf of Matisse, Takacs continued to provide financial consulting services to Pacific USA until 2004, when the contract expired.  Pacific USA paid Matisse for those services, and Matisse transferred those payments to SPIB.

While he was working with Pacific USA, Takacs became a member of SPIB. Bagley, who had held his member interest individually, contributed his member interest to Princeton Partners.  By late 2000, SPIB was owned 40% by Princeton Partners, 40% by Takacs, and 20% by Jackson.  Bagley was sole manager of SPIB until its 2010 bankruptcy filing.

### D.   American Realty Trust, Inc.

On April 13, 2000, Matisse entered into a Financial Consulting Agreement with American Realty Trust, Inc. ("ART").  Under the Agreement, ART was to pay Matisse $200,000 per month, and Bagley was to serve on ART's board of directors and to be named chair of the board.  Bagley also became ART's CEO.  Takacs was named Managing Director – Strategic Development.

Shortly after the Agreement was signed, ART's management company's executives Gene Phillips and Cal Rossi were indicted on securities fraud charges (of which they were later acquitted).  The publicity surrounding the indictments caused ART's stock to drop and ART's lenders to make margin calls, creating a financial emergency. Gene Phillips's son led an effort to obtain forbearance agreements from ART's lenders. Bagley (assisted by Takacs) pursued an unauthorized course, negotiating a letter of intent with a large institutional investment fund.  The letter of intent contained a no-shop clause that precluded the forbearance agreements.  Bagley concealed the letter of intent from ART until after it had been executed.  When the rest of ART's board learned of the letter of intent, the board removed Bagley from his board chair and CEO positions, terminated the Agreement, and initiated the first of several lawsuits.

3

     **E.**     **ART Texas Federal Court Case.**

On June 26, 2000, ART sued Matisse, Bagley, and Takacs in Texas state court, asserting breach of the Agreement and breach of fiduciary duties. The defendants removed the case to the U.S. District Court for the Northern District of Texas and filed counterclaims against ART based on breach of contract. In August 2002, after a ten-day trial, the jury found in favor of ART on its breach of contract claims against Matisse, Bagley, and Takacs, and on its breach of fiduciary duty claims against Matisse and Bagley, but the jury awarded no damages on those claims. The jury found against Matisse on its breach of contract counterclaim. In September 2002, the U.S. District Court entered a JNOV in favor of Matisse, Bagley, and Takacs and awarded Matisse a judgment against ART for $4.4 million, plus prejudgment interest of $624,821.91.

ART appealed to the U.S. Court of Appeals for the Fifth Circuit.

     **F.**     **Great Western Sugar Building, LLC.**

Sugar Cubed, LLC owned a member interest in Great Western Sugar Building, LLC ("GWSB"), which renovated and owned the Sugar Building, a historic office building in Denver, Colorado. SugarSuites, LLC owned land adjacent to the Sugar Building. SPIB entered into a long-term lease for office space in the Sugar Building, and was granted a 10% member interest in both Sugar Cubed and SugarSuites as consideration for entering into the lease.

SPIB began leasing office space from GWSB in May 2000. The rent was payable monthly, in advance, and the primary term of the lease expired on December 31, 2006. SPIB joined GWSB as a co-borrower on a loan from a bank in order to finance substantially all of the tenant finish allowance GWSB granted to SPIB under the terms of the lease (the "Tenant Finish Loan"). Bagley also individually guaranteed the Tenant Finish Loan. SPIB signed a lease on three floors and subleased the space to tenants, the largest of which were SPAS and Hamilton Lane.

From 2000 until 2006, the Stone Pine entities used a common office address in the Sugar Building, 1530 16th Street, Suite 200, in Denver, Colorado. The companies used the same telephone number and a joint receptionist.

     **G.**     **HLSP Investment Banking LLC and Private Equity Management Group.**

In 2002-2003, while still acting as manager of Matisse, Takacs rented a house in the name of Matisse in Miami, Florida and hosted numerous individuals for the purpose of soliciting business for Matisse.[2] During this time, Takacs introduced Riaz Villani ("Villani"), a friend Takacs had known for a number of years, to Bagley. Villani wanted to pursue an opportunity to bid on Viventures, a private equity manager and general partner

---

[2] Takacs also hosted individuals for the business of Pacific USA, which paid the cost of renting the house.

of a large European venture capital fund.  Bagley asked Hamilton Lane to assist with the bid.

At that time, the ART federal court case was pending.  The principals of Hamilton Lane did not want negative associations from the breach of fiduciary duty claims asserted in the federal court case and did not want to participate in an entity that might be sued by ART.  Bagley and Jackson decided to resurrect a dormant entity that had done no business since its formation in 1998, HLSP Investment Banking LLC ("HLSP IB"), to pursue the opportunity.

HLSP IB acquired a member interest in Private Equity Management Group ("PEMG"), along with Villani and his partners.  PEMG acquired Viventures Partners S.A., and the parties proceeded with the bid.

The parties' efforts were successful.  On October 27, 2003, two agreements were finalized:  (1) HLSP IB and SPAS entered into a Services Agreement with Hamilton Lane; and (2) PEMG entered into an Investment Advisory Agreement with HLSP IB, Hamilton Lane, and SPAS.  Thereafter, Bagley provided consulting services, working from Paris. The consulting fees earned by Bagley were paid to HLSP IB, which in turn paid them to SPIB.  In 2003, HLSP IB received $30,000 from PEMG and paid SPIB $29,454.  In 2004 HLSP IB received $201,296 from PEMG and paid SPIB $201,463.  The payments were treated as income to SPIB on SPIB's financial statements and tax returns.

## H.    GWSB Lease Settlement.

During 2002, GWSB and its affiliated entities, including Sugar Cubed and SugarSuites, experienced financial difficulties, and GWSB failed to make required payments on the Tenant Finish Loan, which Bagley had personally guaranteed.  SPIB and Bagley sued GWSB, Sugar Cubed and other related parties to reduce their obligations under the GWSB lease and the Tenant Finish Loan.  In February 2003, a settlement was reached, with the following terms: (i) the amount of office space leased by SPIB was reduced by 50% effective January 1, 2003; (ii) SPIB was relieved of its obligation to pay $414,960 of delinquent rental payments attributable to the year ended December 31, 2002; (iii) SPIB agreed to make rental payments equal to $41,496 per month during the year ended December 31, 2003 and $20,748 per month during the remaining three years of the lease; (iv) SPIB agreed to have its member interests in Sugar Cubed and SugarSuites redeemed for no consideration; and (v) SPIB signed two notes payable, in the combined principal amount of $308,789, which was approximately equal to the tenant improvement allowance that SPIB received from GWSB with respect to the 50% of the office space that was relinquished as part of the settlement.  A portion of the note payments was used to satisfy the Tenant Finish Loan.  SPIB accounted for the note payments as additional rent expense.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

### I.      Transportech, LLC.

In late 2003 or early 2004, Takacs began working on the Transportech deal, which involved converting a Chilean bus system from cash payments to a trackable card system, using technology developed by Pacific Electric.   Takacs entertained representatives of Pacific Electric and their tech team at the house in Miami rented in the name of Matisse, working on the deal for over a month.   Takacs also retained attorney Gary Leonard ("Leonard") to assist with the deal.   A new entity, Transportech, LLC ("Transportech"), was created to hold SPIB's interest in the deal.   Transportech was owned 100% by SPIB.   In August 2004, Bagley traveled to Chile to conduct due diligence. Bagley determined to fund Transportech by diluting a portion of the stock SPIB held in a company called Newtek Business Services ("Newtek").

### J.      Newtek Business Services.

During 2001, SPIB acquired a 10% member interest in Wilshire Colorado Partners, LLC ("Wilshire").   SPIB entered into a consulting agreement with Wilshire's investment manager, The Whitestone Group, LLC ("Whitestone"), pursuant to which SPIB was entitled to receive a quarterly fee in an amount equal to 10% of the management fee Whitestone received from Wilshire.

That consulting agreement expired in October 2004 and was not extended. Instead, in August 2004, SPIB negotiated an agreement with Newtek pursuant to which SPIB would exchange its member interest Wilshire for Newtek stock.   SPIB was to receive $250,000 worth of Newtek stock.

When the transaction closed on August 24, 2004, Newtek stock was $3.52 per share, making the market value of the Newtek stock SPIB received $263,472.   Bagley determined SPIB should value the Newtek stock at a 50% discount due a two-year lock-up provision.

On August 25, 2004, SPIB borrowed $100,000 from Newtek.   SPIB distributed the cash to Transportech, which in turn transferred over $75,000 to Takacs.

### K.      Fifth Circuit Appeal and Remand.

On December 17, 2003, the U.S. Court of Appeals for the Fifth Circuit issued its decision in the Texas federal court case, affirming in part and reversing in part.   The Fifth Circuit affirmed the District Court's holding that Bagley and Takacs could not be individually liable for breach of contract, but it reversed the District Court's entry of judgment in favor of Matisse and against ART on the breach of contract claims and the breach of fiduciary duty claims.   The Fifth Circuit remanded for entry of judgment in favor of ART on its breach of contract and fiduciary duty claims, with no damages to be awarded on those claims, but with the District Court to consider ART's entitlement to attorney's fees.  *American Realty Trust, Inc. v. Matisse Capital Partners LLC*, 91 Fed. Appx. 904 (5th Cir. 2003).

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

On remand, ART sought its attorney's fees from Matisse, as the prevailing party under the parties' contract. The matter was referred to a Magistrate Judge. On September 14, 2004, the Magistrate Judge granted ART's motion for attorney's fees, to be awarded after submission of a separate application. By order entered December 9, 2004, the Magistrate Judge recommended ART be awarded attorney's fees of $1,209,601.40 and costs of $179,625.12. *American Realty Trust, Inc. v. Matisse Capital Partners LLC*, No. Civ.A.3:00CV1801–G, 2004 WL 2847835 (N.D. Tex. Dec. 9, 2004). The District Court adopted the Magistrate Judge's recommendations and entered judgment in favor of ART in the amount of $1,389,226.52, with post judgment interest on the total amount at the rate of 2.82% (the "ART Federal Judgment"). *See American Realty Trust, Inc. v. Matisse Capital Partners LLC*, No. Civ.A.3:00CV1801–G, 2005 WL 81705 (N.D. Tex. Jan. 13, 2005).[3]

## L.    Takacs's Member Interest in SPIB.

In November 2004, Takacs assigned his membership interest in SPIB to Princeton Partners. After that transaction, SPIB was owned 80% by Princeton Partners and 20% by Jackson. Takacs continued to work on the Transportech project. By December 31, 2004, SPIB advanced Takacs an additional $122,590 to fund his work in Chile.

## M.    Matisse Dissolution.

On January 26, 2005, within two weeks of the entry of the ART Federal Judgment, Matisse's bank account was closed. On June 3, 2005, Jackson sent Bagley the following email:

Paul:

Earlier this year, we spoke regarding the possibility of legally terminating Matisse. Your conclusion was not to file the paperwork required to dissolve it, but to simply not file the required annual report when it came due and let the Colorado Secretary of State administratively dissolve it as a result of our failure to file the annual report.

In accordance with those discussions, I did not file the annual report when it was due earlier this year. Today, I received a notice from the Secretary of State regarding the delinquent status. The notice states that failure to file the delinquent report within 60 days (by July 31, 2005), will result in administrative dissolution/revocation.

Unless I hear otherwise from you, I will assume that there has been no change in plans and therefore I will not file the delinquent report and will thus allow Matisse to be administratively dissolved as of July 31, 2005.

---

[3] As a result of technical problems with the January 13, 2005, Judgment, the District Court entered a corrected judgment on August 29, 2005.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Email, Exhibit 216.

The next day, Bagley responded: "Absolutely!  There hasn't been a peep out of Phillips so far."  *Id.*  By Phillips, Bagley was referring to Gene Phillips of ART.

In 2005, ART attempted to collect on the ART Federal Judgment.  ART sent post-judgment discovery to the attorney who had represented Matisse in the federal court case but received a response that the attorney was no longer representing Matisse.  ART then sent the discovery to Jackson, Matisse's registered agent in Colorado, but the discovery was returned by the post office.

N.     **TechFund.**

On May 11, 2005, Takacs, acting on behalf of "HLSP Hamilton Lane/Stone Pine" ("HLSP"), signed a Letter of Intent addressed to TechFund, setting forth HLSP's interest in purchasing an equity interest of TechFund's management company's private equity division.  The Letter of Intent set out the following information about HLSP:

Stone Pine is a private equity investment firm and Hamilton Lane, a leading private equity advisor and gatekeeper that advises on $30bn in institutional capital earmarked for the private equity asset class.

HLSP focuses on acquiring management companies of private equity and venture capital investment partnerships that may be in transition.  In 2003, our firm completed the acquisition of Vivendi Universal's EUR 300 MM private equity division, Viventures Partners SA, based in Paris.  In 2004, we completed the acquisition of the Sandoz Family Foundation's private equity division, SFF Financial Services SA, based on Geneva.

Letter of Intent, Exhibit 532.  The Letter of Intent included the following as HLSP's principal contact persons for the transaction:

Mr. Jack Takacs
HLSP
1530 16th Street
Suite 200
Denver, Colorado 80202
[phone and fax numbers omitted]
jtakacs@stonepinecompanies.com

Mr. Jean-Jacques Dahan
HLSP
1530 16th Street
Suite 200
Denver, Colorado 80202

[phone and fax numbers omitted]
jjdahan@stonepinecompanies.com

Charlotte Carsh for Paul Bagley
HLSP
1530 16th Street
Suite 200
Denver, Colorado 80202
[phone and fax numbers omitted]
ccarsh@stonepinecompanies.com

*Id.* There was no entity named "HLSP Hamilton Lane Stone Pine"; Takacs was referring at least in part to HLSP IB, the entity that completed the acquisition of Vivendi Universal's private equity division, Viventures Partners SA, as part of the PEMG deal.

## O. Fortune Management, Inc.

While Takacs was working on the Transportech deal in Chile, his acquaintance Hermann Seiler introduced him to Renee Mueller ("Mueller"), CEO of Fortune Management, Inc. ("Fortune"). Fortune was in the wealth management business in Switzerland and was interested in raising funds to acquire other wealth management companies. Takacs retained Leonard, who had worked on Transportech, to assist with a potential deal with Fortune. Takacs approached Bagley about the deal in April 2005.

On May 30, 2005, Mueller sent Takacs (by email to jtakacs@stonepinecompanies.com) and Bagley (by email to Charlotte Carsh, who forwarded it to Bagley at pbagley@stonepinecompanies.com) a Draft Letter of Intent for the Fortune transaction (the "May 30 Draft LOI") and a Draft Press Release (the "May 30 Draft Press Release"). The May 30 Draft LOI from Fortune was addressed to Takacs and Bagley at "The Stone Pine Investment Banking L.L.C.," 1530 16th Street, Denver, CO 80202. It provided in part:

This Letter of Intent ("LOI") shall outline the general terms and conditions under which FORTUNE Management, Inc. ("Fortune") proposes to acquire 100% of the shares of Hamilton Lane / Stone Pine Investment Banking HLSP ("HLSP") [check legal form], a joint venture between The Stone Pine Companies ("SPCs") and Hamilton Lane ("HL") (combined referred to as "Sellers") (together with Fortune, referred to as "Parties").

1.      Preamble

1.1.    HLSP
        HLSP was formed as a joint-venture between SPCs and HL with the purpose of executing a roll-up strategy in the market of private equity managers. It has participated in another joint-venture in which already two such managers have been acquired. It further owns a

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

> substantial deal pipeline in the creation and management of new
> private equity funds as well as certain principal merchant banking
> deals.

May 30 Draft LOI at 1, Exhibit 212.  The May 30 Draft LOI stated HLSP had a pipeline of deals that had a "combined immediate recurring net income potential of ca. USD 10-15 million per year.  These deals and their current potential are summarized in Annexe 2 (Deal Pipeline).  The probability attributed to each deal multiplied with the NPV of the expected earnings will be added to the valuation of HLSP."  *Id.* at 2, ¶ 3.1.2.  The May 30 Draft LOI further stated "the built-up brands of both parties constitute a key asset.  Therefore it is in the best interest to pertain the corresponding names, HLSP for the private equity business, Fortune as the name of the quoted entity as well as in the IAM sector."  *Id.* at 4, ¶ 5.2.

Mueller also attached a draft press release in German and English, with the English version stating as follows:

> Fortune Management, Inc. . . . and Hamilton Lane / Stone Pine Investment
> Banking (HLSP) have entered into a Letter of Intent.

> HLSP is a joint venture between Hamilton Lane, Philadelphia and The
> Stone Pine Companies L.L.C., Denver, which principal purpose is the
> consolidation of private equity management companies on a global basis.
> HLSP's set-up is therefore similar to that of Fortune Management, which
> focuses its business model on the consolidation of independent asset
> managers.  By entering into a strategic partnership, both companies expect
> to unlock synergies in administrative as well as capital market tasks.

> The companies have agreed to conduct a due diligence in the coming
> weeks, with the objective to reach a definitive agreement in due course.

May 30 Draft Press Release, Exhibit 212.

On June 1, Leonard emailed Takacs and Bagley with his comments to the May 30 Draft Press Release.  Leonard made very few changes overall, none to the parties or their names and none to the substance of the press release.  Neither Bagley nor Takacs suggested any changes, and Fortune issued the press release as drafted above (the "Fortune Press Release").

### P.    Nomura International PLC.

Takacs had a relationship with executives of Nomura International PLC ("Nomura"), a large Japanese investing firm.  Takacs and representatives of Nomura discussed the purchase of a leveraged private equity fund to be managed by a Stone Pine entity.  On June 9, 2005, a letter agreement (the "Nomura Agreement") was signed by Bagley and Takacs on behalf of "HLSP Stone Pine Investment Banking LLC," and by

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Judith Tan, James Witten, and Neil Basu on behalf of Nomura.  The Nomura Agreement, in the form of a letter addressed to Takacs and Bagley at "HLSP Stone Pine Investment Banking LLC, 1530 16th Street, Suite 200, Denver, Colorado 80202," consists of seven pages of specific details about the parties' agreements and obligations.  It begins as follows:

> We refer to the recent discussions between HLSP Stone Pine Investment Banking L.L.C. ("HLSP"), a joint venture between Hamilton Lane Advisers and Stone Pine Companies, and Nomura International plc ("Nomura" or the "Arranger") with respect to HLSP's intention to raise up to €1,000,000,000 from debt and equity investors in the form of a Collateralised Fund Obligation issue ("CFO") for investment in a diverse portfolio (the "Portfolio") of buy-out and venture capital private equity funds (the "Transaction").  An indicative summary Terms and Conditions of the CFO are included in Annex 1.

> Nomura understands that HLSP wishes to undertake a number of similar transactions following the successful closing of the Transaction and confirmed that it is fully prepared and committed to working with HLSP on a series of similar private equity securitisations in the future.

Nomura Agreement at 1, Exhibit 217.  The attached Annex 1 provides Hamilton Lane will serve as investment adviser, and HLSP Stone Pine Investment Banking LLC will provide monitoring functions with respect to the portfolio.

### Q.    Meetings in London in 2005.

Bagley submitted an expense report for documentation for a trip he took to London June 8 to 20, 2005.  On his expense report (Exhibit 215), he represented the business purpose of his trip was "SPIB mtg. in London with Nomura (Judith Tan) and Fortune" and the appropriate account to be charged for the expenses was "SPIB – Fortune."  He further represented on June 9, the date the Nomura Agreement was signed, he entertained "Rene Mueller – Fortune and Jack Takacs – SPIB" at the Colony Club for a discussion of Nomura, at a cost of $431.80, and on June 16, he entertained "Jack Takacs – SPIB" at Flemings for a discussion of Fortune, at a cost of $81.93.  He asked that the expenses be added to his loan balance.

### R.    Attorney Gary Leonard.

On June 17, 2005, Leonard emailed Takacs and Bagley an Engagement Agreement covering his prior services and expected future services to Stone Pine related entities.  The Engagement Agreement was addressed to Bagley and Takacs at "Hamilton Lane/Stone Pine Investment Banking LLC."  It provided for Leonard to act as "special corporate counsel for Hamilton Lane/Stone Pine Investment Banking LLC ('HLSP') in connection with proposed merger of HLSP into Fortune Management, Inc. ('Fortune')."  For his services, he was to be paid shares of Fortune stock.  Engagement Agreement

at 1, Exhibit 219.  The Engagement Agreement provided for the signatures of both Bagley and Takacs, on behalf of "Hamilton Lane/Stone Pine Investment Banking LLC."

In addition to the Engagement Agreement, Leonard also included a draft Agreement and Plan of Merger between and among the following: (1) Fortune Management, Inc., a Delaware Corporation ("Fortune"); (2) Fortune Merger Corp., a Delaware corporation and a direct wholly-owned subsidiary of Fortune ("Merger Sub"); and (3) HLSP Merger Corp., a Delaware Corporation ("HLSP").  The Agreement provided for "a business combination by means of the merger of HLSP with and into Merger Sub." Draft Agreement at 1, Exhibit 219.  The Agreement defined "HLSP Assets" as "Hamilton Lane Shares and the HLSP Deal Pipeline" and defined "HLSP Deal Pipeline" as "the pending and potential transactions listed in Schedule 1.1 of the HLSP Disclosure Schedules."  The Agreement contained a warranty that

> Each of the potential transactions in the HLSP Deal Pipeline represents a bone fide negotiation on the part of HLSP, at the stage described in Schedule 1.1 of the HLSP Disclosure Schedules.  HLSP has no knowledge of any event or fact which would prevent the consummation of any transaction in the HLSP Deal Pipeline . . . .

Draft Agreement, Exhibit 219.  The Agreement provided notice to HLSP be sent to "Hamilton Lane/Stone Pine Investment Banking, LLC Sugar Building, Suite 200, 1530 16th Street, Denver, Colorado 80202 Attention: Paul Bagley & Jack Takacs," with a copy to Leonard.  *Id.*

Bagley responded on June 19, instructing Leonard to use a new entity, rather than HLSP, "so as not to contaminate the transfer."  Bagley asked Leonard to prepare a simple assignment for the Nomura and Moneda deals, but stated the transfer of the Hamilton Lane interest was more complicated, and he was in the process of working out the details with Hamilton Lane.  Leonard, in turn, responded that he would form a new Delaware company into which the Hamilton Lane shares and deal pipeline (specifically, Nomura, Moneda Asset Management, S.A., and TechFund) would be transferred, and the new, "uncontaminated" company would merge into a Delaware sub of Fortune in return for Fortune stock.  Exhibit 1336.

Instead of forming a new company for the transaction, the parties decided to use a Puerto Rican corporation previously formed by Leonard, who was a resident of Puerto Rico.  The corporation, originally formed in March 2005 and in August 2005 renamed Private Equity Accelerated Value Corp., was renamed HSLP Holdings, Inc.  Takacs was named sole director and President of HLSP Holdings, Inc. and Bagley was named Vice President.

On June 21, 2005, Leonard emailed Bagley and Takacs a Shareholders' Agreement for "HLSP Holdings, Inc., the company which will hold the Fortune shares." Leonard email, Exhibit 222.  The Shareholders' Agreement represents that HLSP Holdings Corp. is duly incorporated in Delaware, and that Bagley, Takacs, and Hermann

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Seiler are the shareholders of HLSP Holdings Corp. *See* Shareholders' Agreement, Exhibit 222.

Leonard subsequently revised his Engagement Agreement to reflect his retention as special corporate counsel for "HLSP Holdings Corp., HLSP Investment Banking LLC, and Hamilton Lane/Stone Pine Investment Banking, LLC (collectively, 'HLSP') in connection with proposed transfer and exchange of assets by HLSP Holdings Corp. for voting stock of Fortune Management, Inc." Exhibit 233.

### S.    Moneda Asset Management, S.A.

Takacs worked with Moneda Asset Management, S.A. ("Moneda"), a private equity and real estate asset management firm in Chile, to establish a "fund of funds" directed at Chilean pension fund investors. Moneda prepared a draft Letter of Intent, which Takacs initialed but did not sign, in early July 2005 (Exhibit 536). The Letter of Intent is directed to Takacs as President of HLSP Holdings Corp. It provides a joint venture of HLSP and Moneda will manage the fund, while Hamilton Lane will act as financial advisor to the fund.

### T.    Bagley's Discussions with Hamilton Lane.

In late June 2005, Bagley met with representatives of Hamilton Lane to discuss the Fortune deal. The Fortune deal and the underlying deals included in the "deal pipeline" (specifically Nomura, Moneda, and TechFund) anticipated some level of involvement of Hamilton Lane, and the original plan with Fortune also included the transfer of some Hamilton Lane stock to Fortune. But, Hamilton Lane had not agreed to participate in any of the deals, including the Fortune deal. On June 28, Mario Giannini of Hamilton Lane learned of the Fortune Press Release and wrote an email to Bagley stating:

> Why are you and Jack using Hamilton Lane's name and an entity that we are not a part of and saying we have a joint venture in doing this and, worse, doing it in a press release? If this is what is being said to Fortune, Nomura, and the people in Chile, then I have to tell each of them that it isn't true. What's going on?

Email, Exhibit 227. In his response, Bagley blamed Takacs for the errors and tried to convince Hamilton Lane to proceed with the deals. Hamilton Lane's shares were withdrawn from the Fortune Deal, and Bagley sold them[4] to HLA Investments, which had a right of first refusal on the sale of Hamilton Lane stock, for a little over $500,000. Bagley and Hamilton Lane continued discussions about whether Hamilton Lane would participate in any of the "deal pipeline" deals, some of which Hamilton Lane later agreed to, including Nomura.

---

[4] Bagley had purchased the Hamilton Lane shares through a loan from SPIB. Exhibit 199.

### U.     Fortune Deal Closing.

On July 1, 2005, Bagley entered into a Consulting Agreement with Fortune, and Takacs entered into an Employment Agreement with Fortune.  On July 7, 2005, the Fortune transaction was finalized.  HLSP Holdings transferred substantially all of its assets to a newly-created Fortune subsidiary, Fortune Transfer Corp. ("F-Sub"), in exchange for Fortune common stock, which would be liquidated and distributed to HLSP's shareholders in exchange for their HLSP shares.  Specifically, HLSP Holdings transferred its Private Equity Assets, defined as follows:

> "Private Equity Assets" means the pending and potential transactions listed in Exhibit A and all business, contract rights, causes of action, and goodwill in, incorporated or embodied in, used to develop, or related to any of such potential transactions, and the rights to the payment of fees, royalties or other monetary compensation, resulting from, or in connection therewith.

Agreement Regarding Transfer of Assets in Exchange for Voting Stock and Plan of Reorganization, at 4, Exhibit 238.

The Agreement's original Exhibit A, attached to the Agreement and initialed by all parties, list the following Private Equity Assets:

1. **Nomura International** – Nomura has issued a letter dated June 9, 2005 to HLSP Stone Pine Investment Banking LLC agreeing, under certain conditions, to structure and arrange up to € 1 Billion Private Equity Collateralized Fund Obligation (CFO) (backed by a pool of private equity funds) to be managed by HLSP Stone Pine Investment Banking LLC (see attached)

2. **Moneda** – see attached LOI between HLSP Holdings Corp. and Moneda Asset Management, S.A.

3. **Techfund** – see attached LOI between HLSP Hamilton Lane / Stone Pine and Jean-Michel Barbier / TechFund Management Europe

Exhibit 238 at 22.  A different version of Exhibit A, which was not signed or initialed by any party, kept the three listed deals but expanded the discussion of each deal and replaced references to HLSP Stone Pine or HLSP Hamilton Lane/Stone Pine with HLSP. Exhibit 238 at 23.

The Agreement required Bagley and Takacs to close each of the transactions identified as Private Equity Assets and to "forward and refer all future private equity business opportunities to Fortune and, as the case may be, use his reasonable best efforts to pursue such opportunities on behalf of Fortune."  Agreement § 3.5, Exhibit 238 at 5.  The Agreement, therefore, eliminated future private equity business opportunities for SPIB and other Stone Pine entities.

14

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Pursuant to the Agreement, Fortune transferred 33,584,600 shares of Fortune common stock, which were allocated as follows:

| Recipient | Shares of HLSP (if applicable) | Fortune Shares |
|---|---|---|
| Kirkpatrick Lockhart Nicholson & Graham (represented Defendants in Texas Federal Court Case) | n/a | 260,417 |
| Robert Wolin (represented Defendants in Texas Federal Court Case) | n/a | 86,806 |
| Acosta & Ramirez or Juan Acosta | n/a | 50,000 |
| Takacs | 2635 | 12,313,255 |
| Bagley | 1581 | 7,387,953 |
| Jackson | 1054 | 4,925,302 |
| Seiler | 1725 | 8,060,860 |
| Leonard | 107 | 500,007 |

As of June 30, 2005, Fortune stock was trading at €0.92, and one euro was worth $1.2066, so each share was worth $1.11, exclusive of any restriction-based discounts. Exhibit 326.

On July 8, 2005, Fortune issued a press release stating in part as follows:

- **Fortune has acquired the business of HLSP Holdings Corp.**
- **New Private Equity Division "FHLSP Private Equity Group, Inc." established**
- **Paul Bagley becomes new Chairman of the Board of Fortune**
- **Jack Takacs becomes new President, Hermann Seiler new COO**

Zug/Switzerland, July 8, 2005 - The board of Fortune Management Inc. . . . has - with resolution on July 7, 2005 and following the Letter of Intent on June 2, 2005 - decided to acquire the private equity business and managing principals of HLSP Holdings Corp., a member of The Stone Pine Group of Companies, Denver, in exchange for the issuance of 33,584,600 restricted shares of Fortune common stock. Primarily, HLSP Holding Corp. comprises of a pipeline of private equity transactions in differing stages of negotiation. Such transactions include the acquisition of a number of private equity management firms in various countries as well as an agreement with a major international investment bank for the underwriting of a substantial new private equity fund.

15

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

July 8 Press Release, Exhibit 579.  Mueller sent Bagley a draft of the July 8 Press Release before it was issued, and Bagley provided a quote to be included in it.  Email, Exhibit 241.

### V.    SPIB Payment of Fortune Expenses.

SPIB funds were used to pay the following Fortune expenses:

| Recipient | Amount |
|---|---|
| Gary Leonard | $1,500.00 |
| Gary Leonard | $1,500.00 |
| Rodriguez Marxauch (law firm in Puerto Rico) | $1,500.00 |
| Paul Bagley expenses (London trip) | $817.23 |
| Delaware Corp. | $100.00 |

Exhibit 348.  As Bagley explained by email to Sande Hempelmann of SPAS, in response to her question of how to treat a Gary Leonard expense:

> This expenditure is for the legal expenses necessary to close the sale of HLSP to Fortune. They are not reimbursable by Fortune as the agreement requires each party to bear its own expenses.  SPIB controls HLSP and the shares are allocated to Don, Jack and I.  Any accounting treatment you think proper is fine with me.

Email, Exhibit 240.  SPIB treated the expenses as receivables from HLSP Holdings (which were not paid by HLSP Holdings) and ultimately accounted for as reductions of Bagley's and Jackson's capital accounts.  Exhibit 348.

### W.    SPIB Payment of Other Expenses in 2005.

In 2005, SPIB's main employees were Bagley and Bagley's assistant, Charlotte Carsh.  Carsh continued to be paid by SPIB after the Fortune deal closed in July, but SPIB began billing Fortune for 50% of her salary.

Even though its work and workforce had dwindled, SPIB continued to lease its full office space in the Sugar Building throughout 2005, spending $518,106 on rent for the year.  By December 31, 2005, all the notes related to GWSB, including the Tenant Finish Loan that had been personally guaranteed by Bagley, were paid in full.

In August 2005, SPIB sold its Newtek stock for $100,000, and the sales proceeds were used to pay the Newtek loan in full.

### X.    Takacs 1099.

In 2005, it became clear the Transportech opportunity lacked sufficient support from stakeholders in Chile and would not succeed.  In early 2006, disputes arose between Takacs and Fortune management, including Bagley.  Takacs subsequently terminated

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

his employment with Fortune pursuant to a severance package.  Later in 2006, Bagley and Jackson compiled a list of expenses SPIB had paid on behalf of Transportech and decided to treat them as receivables owed by Takacs.  The expenses, totaling $192,703.33, included business expenses such as telephone, email and internet access, legal fees, expense reimbursements previously paid to both Takacs and Bagley, and $10,000 cash advanced to Bagley in March 2005.  Exhibit 507.  Some of the expenses included were actually PEMG-related expenses.  *Id.*

The expenses SPIB sought to recover from Takacs were incurred between 2004 and 2006.  When SPIB prepared its 2004 year-end financial statement in 2005, the expense incurred in 2004 were not treated as receivables from Takacs.  It was not until late 2006 that SPIB began treating the expenses as receivables from Takacs.

Takacs testified the parties had no understanding Takacs would reimburse SPIB for Transportech expenses.  When Takacs refused to pay SPIB for the expenses, SPIB issued Takacs a 1099, reflecting the expenses as income received in 2006.

### Y.    PEMG Payout.

In 2006, the parties negotiated an early termination of the Investment Advisory Agreement, with HLSP IB to receive $1.8 million as a discounted payout of what was left on the agreement.  When HLSP IB received funds from PEMG, it did not transfer the funds to SPIB as it had done previously.  Instead, the funds were distributed to Princeton Partners and Jackson according to their ownership interests in HLSP IB (and also SPIB), 80% Princeton Partners and 20% Jackson.  Bagley and Jackson agreed to deposit funds into SPIB, with the understanding the funds would be used to pay debts owed to Bagley, SPAS, and other insiders.  Email from Bagley to Jackson, Exhibit 282; email from Jackson to Bagley, Exhibit 513.

On May 23, 2006, PEMG paid HLSP IB the first $900,000.  Applying the 80/20 split, HLSP IB paid $720,000 to Princeton Partners and $180,000 to Jackson.  After receiving the funds, Princeton Partners and Jackson made the following capital contributions to SPIB, which funds were distributed as follows:

| Date | Transaction | Amount |
|------|-------------|--------|
| 05/24/06 | Capital contribution from Princeton Partners | $720,000.00 |
| 05/25/06 | Capital contribution from Donald Jackson | $144,000.00 |
| 05/26/06 | Repayment of loan and interest to FCM Fiduciary Capital Management Company | -$61,034.25 |
| 05/26/06 | Repayment of loan and interest to FCM Fiduciary Capital Corporation | -$537,560.28 |
| 05/26/06 | Payment to Ray Redfern for painting, treated as repayment of loan owed to Bagley | -$90,000.00 |

| 05/26/06 | Payment to U.S. Treasury for Bagley's taxes, treated as repayment of loan to Bagley | -$253,222.85 |
| 06/05/06 | Advance from Princeton Partners | $451,953.70 |
| 06/09/06 | Hamilton Lane related stock payment to Wayne Harber, treated as consulting fee expense | -$42,709.00 |
| 06/09/06 | Payment to Fortune Management, Inc., treated as repayment of loans to Bagley and Princeton Partners | -$310,000.00 |
| 07/27/06 | Advance from Bagley | $15,000.00 |
| 08/18/16 | Payment to Stromberg & Associates, treated as SPIB legal expense | -$20,000.00 |
| 09/01/06 | Advance to Bagley | -$39,023.62 |
| | **Subtotal** | **-$22,596.30** |

On September 1, 2006, PEMG paid HLSP IB the remaining $900,000.  HLSP IB paid $712,000 to Princeton Partners and $178,000 to Jackson.  After receiving the funds, Princeton Partners and Jackson made the following capital contributions to SPIB, which funds were distributed as follows:

| Date | Transaction | Amount |
|---|---|---|
| 09/01/06 | Capital contribution from Princeton Partners | $425,600.00 |
| 09/02/06 | Capital contribution from Jackson | $142,400.00 |
| 09/05/06 | Advance to Bagley | -$125,000.00 |
| 10/04/06 | Hamilton Lane stock related payment to Duke DeGrassi, treated as consulting fee expense | -$42,709.00 |
| 10/27/06 | Payment to U.S. Treasury for Bagley's 2004 taxes, treated as repayment of loan to Bagley | -$36,850.00 |
| 11/14/06 | Payment to Stromberg & Associates, treated as SPIB legal expense | -$10,000.00 |
| 12/07/06 | Payment to U.S. Treasury for Bagley's 2005 taxes, treated as repayment of loan to Bagley | -$84,571.00 |
| | **Remaining cash in SPIB** | **$246,273.70** |

Exhibit 331.

### Z.    Texas State Court Case.

ART's efforts to collect on the ART Federal Judgment had not been successful, so on July 26, 2006, ART filed suit against Bagley, Takacs, Matisse, Stone Pine Capital, Stone Pine Financial, and SPIB, in the Dallas County, Texas State Court, case number DC06-07115 (the "Texas State Court Case"), asserting claims based on (1) fraudulent transfer under the TUFTA, Tex. Bus. & Comm. Code § 24.001, *et seq*.; (2) common business enterprise and conspiracy; and (3) constructive trust.   ART also sought

18

enforcement of post-judgment discovery, turnover, and its attorney's fees.   On September 5, 2006, the Texas Secretary of State attempted to serve Matisse with the Complaint filed in the Texas State Court Case, using the address 1530 16th St., Ste 200, Denver, CO 80202-1468, but it was returned "Not Deliverable as Addressed, Unable to Forward."

### AA.   Fortune Stock.

The Fortune stock allocated to the HLSP shareholders was not immediately registered on the Frankfurt stock exchange and, therefore, was not immediately freely tradeable.  Fortune registered the stock on February 23, 2007, but the stock did not become freely tradable until after the expiration of a six-month lockup period, on August 24, 2007.

Between the time of the Fortune deal closing in July 2005 and the expiration of the lockup period in August 2007, HLSP shareholders were limited to private, off-market trades of their stock, which reduced the price they could obtain.  Meanwhile, the price of Fortune's stock had risen significantly after the deal closing.  Exhibit 273, page 8.  On May 8, 2006, Takacs sold 1 million shares of the stock for €1.77 per share to Fortune insider Mark Kuebler.  At that time, Fortune stock traded at prices exceeding €3.3 per share.  On December 12, 2006, Takacs sold another 500,000 shares to Kuebler for €2.5 per share.  At that time, Fortune stock traded at prices exceeding €3.8 per share.

Takacs planned to sell 80,000 shares to Bagley's father, James Bagley ("J. Bagley").  It is unclear whether this transaction occurred.  Bagley also planned to sell stock to J. Bagley.  Bagley described the terms of the sale differently in different emails.  In a February 17, 2006, email to Leonard, Bagley described a sale of 80,000 shares (60,000 to J. Bagley and 20,000 to Raymond Bagley).  See Exhibit 284.  In a March 4, 2006, email to Sande Hempelmann of SPAS, Bagley described a sale of 100,000 shares (all to J. Bagley).  See Exhibit 288.   In another March 4, 2006, email to Sande Hempelmann, Bagley described a sale of 80,000 shares to J. Bagley.  See Exhibit 289.  J. Bagley sent a $40,000 check to "Stone Pine," with a memo noting 80,000 shares of Diego Gas, which Bagley explained was J. Bagley's nickname for Fortune.  The funds were deposited into SPIB and treated as a loan to SPIB from Bagley.  In a February 1, 2007, email to Jackson, Bagley described a sale of 75,000 shares to J. Bagley.  See Exhibit 333.  At trial, when questioned about the discrepancies, Bagley testified that no sale ever took place, and the statements he had made in the emails were all mistakes.

By August of 2008, the Fortune stock had become almost worthless, after one of its significant projects, GATE Biodiesel, failed.  HLSP Holdings sued Fortune to recover damages for Fortune's delay in registering the stock, which prevented earlier, more lucrative sales.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

### BB.    SPIB payments in 2007.

In 2007, the Stone Pine entities left the Sugar Building.  SPAS leased an office in the Denver Tech Center, 4582 South Ulster Street, Suite 1600, Denver, Colorado 80237. SPIB did not pay rent to SPAS, but SPIB employee Charlotte Carsh worked out of that office, and SPIB reimbursed SPAS for her payroll and insurance costs as well as postage, telephones, and similar charges.  Exhibit 325.

SPIB made the following payments (the "Identified Transactions") from December 2006 through 2007:

| Date | Payee | Amount | Check # or ID |
|------|-------|--------|---------------|
| 12/7/2006 | US Treasury | $84,571.00 | 10889 |
| 12/12/2007 | Paul Bagley | $20,000.00 | Wire Transfer |
| 12/12/2007 | US Treasury | $114,520.00 | 10894 |
| 2/6/2007 | Paul Bagley | $47,000.00 | Wire Transfer |
| 2/13/2007 | Paul Bagley | $15,000.00 | Wire Transfer |
| 2/21/2007 | Stone Pine Accounting Services, LLC | $5,000.00 | 10901 |
| 3/2/2007 | Stone Pine Accounting Services, LLC | $3,000.00 | 10902 |
| 3/8/2007 | Paul Bagley | $9,000.00 | Wire Transfer |
| 3/9/2007 | HLPEF/SP Management, LLC | $30,000.00 | 10903 |
| 3/14/2007 | Stone Pine Accounting Services, LLC | $6,000.00 | 10904 |
| 3/19/2007 | HLPEF/SP Management, LLC | $8,600.00 | 10906 |
| 3/22/2007 | Paul Bagley | $35,000.00 | Wire Transfer |
| 4/30/2007 | US Treasury | $17,496.50 | 10909 |
| 5/2/2007 | Paul Bagley | $7,000.00 | Wire Transfer |
| 6/1/2007 | Paul Bagley | $5,000.00 | Wire Transfer |
| 6/4/2007 | Stone Pine Accounting Services, LLC | $16,300.00 | 10913 |
| 6/12/2007 | HLPEF/SP Management, LLC | $10,815.00 | 10914 |
| 6/20/2007 | Stone Pine Accounting Services, LLC | $1,914.74 | 10915 |
| 6/21/2007 | Paul Bagley | $2,500.00 | Wire Transfer |
| 6/21/2007 | Kathleen Bagley | $8,000.00 | Wire Transfer |
| 6/27/2007 | Stone Pine Accounting Services, LLC | $2,500.00 | 10918 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

| | | | |
|---|---|---|---|
| 7/5/2007 | Paul Bagley | $13,000.00 | Wire Transfer |
| 7/9/2007 | Stone Pine Accounting Services, LLC | $9,000.00 | 10919 |
| 8/29/2007 | Paul Bagley | $5,000.00 | Wire Transfer |
| 8/29/2007 | Paul Bagley | $1,000.00 | Wire Transfer |
| 9/12/2007 | HLPEF/SP Management, LLC | $8,322.00 | 10925 |
| 10/4/2007 | HLPEF/SP Management, LLC | $15,000.00 | 10926 |
| 12/12/2007 | Stone Pine Accounting Services, LLC | $12,500.00 | 10927 |
| 12/26/2007 | Stone Pine Accounting Services, LLC | $6,217.00 | 10932 |
| 12/27/2007 | HLPEF/SP Management, LLC | $8,000.00 | 10933 |
| 12/31/2007 | Paul Bagley | $2,000.00 | Wire Transfer |
| | Total | $529,256.24 | |

**CC.   2008 Indemnification and Payments.**

In early 2008, Bagley and Jackson worked to "formally dissolve as many of the Stone Pine entities as possible." Email, Exhibit 375. Aware that the Texas State Court Case was headed to trial in 2009, Bagley and Jackson undertook efforts to ensure SPIB had no remaining assets by the time of trial. In February 2008, Bagley wrote Jackson:

Don:
1. Your memo [which proposed structuring the upcoming HLPEF payout in a way that minimized assets to be retained by SPIB] makes sense to me and we should proceed accordingly. The only refinement I might suggest is that SPIB transfers $65,000 to the Stromberg litigation trust account immediately upon receipt. This transfer should be done with the precise regard to having SPIB make the payment in its capacity as a named defendant. Since SPIB "owned" Matisse it should indemnify all of the other named parties, including SPAS in a formal letter agreement. I did one of these in the HLA-ART case so if we can [find] it we can mark that up. I would also like SPIB to get current with SPAS, including a payroll reserve amount on deposit to cover salary payments.
2. I want all of [Princeton Partners'] cash held in the PP checking account, with the exception of a 100,000 wire transfer to my Century Bank account.
3. I like the idea of exchanging SPIB's remaining share of HLPEF for the debt it owes to ANSM. Let's use Lyle to do the formal transfer/exchange documents. I would also like him to review our corporate documentation for 2007 and prepare any minutes, resolutions, etc. that might be warranted.

21

For example should we have any partner or board meetings following the
year-end?  We should also review the remaining operating subsidiaries with
a view to getting rid of all shell companies that are no longer needed.

4. Pls offer Andy Cahill [former SPIB employee who had outstanding expense
reimbursement requests] a 75% settlement amount on the accumulated
T&E's he still has on the books, with the explanation that we are trying to
clean up SPIB before the trial starts.  Any other similar "tag ends" should
also be considered.

Email, Exhibit 360.

### DD.  Transfer of HLPEF/SP Management Interest to American National Security Management, LP.

HLPEF/SP Management was originally Stone Pine Asset Management, the entity
formed in 1998 to focus primarily on private equity management opportunities.  When
SPAM's management team left SPAM for Hamilton Lane, SPAM became a passive entity
holding an interest in European funds formed by Hamilton Lane.  As the holder of a 10%
interest in HLPEF/SP Management, SPIB was generally entitled to receive 10% of
HLPEF/SP's cumulative net profits.  In 2008, Jackson estimated HLPEF/SP Management
would receive between $160,000 to $175,000 from the funds, with SPIB expected to
receive between $16,000 to $17,500.

American National Security Management, LP ("ANSM") was majority owned and
controlled by Bagley.  Bagley and Jackson decided to transfer SPIB's interest in
HLPEF/SP Management to ANSM.  In April 2008, ANSM paid SPIB consideration of
$180,000, consisting of $45,000 cash, a $90,000 offset against interest on cash advances
to SPIB that ANSM had treated as loans, and a $45,000 note receivable, which ANSM
subsequently paid in full, with interest.  Bagley and Jackson had circulated the terms of
the offer to each member in HLPEF/SP Management, according to a right of first refusal,
but no member exercised that right.

### EE.  Texas State Court Case Trial.

Prior to trial, on October 8, 2007, the Texas State Court limited ART's fraudulent
transfer claims to those occurring between September 16, 2002, the date of the original
JNOV entered in favor of Matisse, Bagley and Takacs in the Texas Federal Court Case,
and January 6, 2005, the date Matisse closed its bank account.  ART argued against the
September 16, 2002, date, because at that time ART did not have a judgment in its favor
and would not have been entitled to conduct post-judgment discovery to learn of any
fraudulent transfers.  ART had also argued against the January 6, 2005, date, as it was
just learning of transfers that would have fallen within the original complaint.  ART filed a
motion for reconsideration, which was denied.

In addition, in March 2009, the Texas State Court granted partial summary
judgment in Defendants' favor with respect to ART's alter ego claims against Bagley,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Stone Pine Capital, Stone Pine Financial, and Takacs, and it also granted partial summary judgment on behalf of Takacs, Stone Pine Capital, and Stone Pine Financial with respect to ART's fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act.

The remaining claims went to trial in July 2009, and on July 31, 2009, the jury rendered a verdict in favor of ART. In its verdict, the jury found SPIB was the alter ego of Matisse. The jury did not address the questions of whether fraudulent transfers were made or whether Bagley or Takacs were responsible for SPIB's conduct because the trial court conditioned those questions on a "no" answer to SPIB's being the alter ego of Matisse. The Texas State Court entered its judgment on November 11, 2009, in favor of ART and against SPIB, for the amount of the ART Federal Judgment, ($1,209,601.40) plus costs ($179,625.12), for a total of $1,389,226.50, plus interest

Both ART and SPIB timely filed notices of appeal. ART appealed the Texas State Court's pre-trial decisions to limit the relevant dates of the fraudulent transfer claims, the grants of summary judgment on the alter ego claims, and the jury charge preventing the jury from determining fraudulent transfers if Matisse was found to be the alter ego of SPIB. The appeals remained pending on the date of SPIB's bankruptcy filing.

### FF.    SPIB Pre-Bankruptcy Filing Strategy.

On November 17, 2009, one week after the Texas State Court entered its judgment, Bagley reached out to Colorado bankruptcy attorney Joli Lofstedt ("Lofstedt"). Bagley told Lofstedt SPIB had only four creditors (ART, SPIB's counsel in the Texas State Court Case, SPAS, and Bagley), SPIB had only two employees (Bagley and his assistant, Charlotte Carsh), and SPIB had no business operations. By November 20, 2009, Bagley had agreed to Lofstedt's engagement letter. By November 23, 2009, Jackson and Bagley had spoken with bankruptcy counsel, and by November 29, 2009, they were working on "clarifying" transfers made or received by SPIB for the past 4 years and explaining the purpose of each receipt and payment.

Bagley and Jackson initially wanted to file SPIB's bankruptcy case by December 10, 2009, to stay the deadline for filing a notice of appeal in the Texas State Court Case. But, they later determined an immediate bankruptcy filing could "let [ART] start over with fraudulent transfer claims out of SPIB." Email, Exhibit 552. Bagley and Jackson therefore decided to "get as much mileage as possible out of the appeal and as a result to hold off on the bankruptcy." *Id.*

By May 19, 2010, Bagley and Jackson closed SPIB's bank accounts.

By June 4, 2010, Lofstedt sent Bagley and Jackson an email stating as follows:

Our firm is still holding a retainer. I thought it would be best to terminate our services and return the retainer. If you decide to proceed with

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

a bankruptcy in the future, please feel free to contact us.  Please let me know if ok, and I will apply our fees and return the balance of the retainer.

Email, Exhibit 561.  Bagley responded:

> Please do not jump the gun on this.  We still intend to file in the near future, however the court process in Texas has been very slow.  Our appeal deadline was just extended again to June 30.

> The reason for our delay is that the four year clock has run on several transactions as the appeal process runs.  There are no other creditors pressing SPIB and the plaintiff in our legal case has taken a very slow approach.  For example they only put up their appeal fee on the last possible day.  That was three weeks ago, and it was only $800.

> This is an unusual case since no creditors (other than affiliates) will remain unpaid, but for the plaintiff.

> We would like to have our appeal on file in Texas when we file the petition so that the trustee can read our position.  Since we have cleared up some possible arguments while waiting for the plaintiff to execute the process it remains to our advantage to force them to take the proper procedural steps.

> Unless they ask for another delay I expect our appeal to be on file by month end and to file the petition in early July.  There will be a minor amount of updating which we will need to review with your firm prior to the actual filing.  All business at SPIB has ceased as of 12/31/09, other than mere administrative tasks.

Email, Exhibit 561.

SPIB requested numerous extensions of the deadline to file its appeal brief as part of its delay tactic, ultimately filing its brief June 28, 2010.  On that same day, Bagley emailed Jackson and SPAS employee Sande Hempelmann, stating the brief had been filed that day, and "[t]his should give us into August before we need to file the SPIB bankruptcy."  Email, Exhibit 454.

In July, Bagley discussed additional delay strategies with Texas counsel, including pursuing an objection to the assignment of a new State Court Judge to the case.  Email, Exhibit 562.  Also, ART had served a motion to compel and a request for production of documents as part of post-judgment discovery.  Bagley, Jackson, and Texas counsel determined that because the request for production of documents covered "all documents and things in the possession, custody, or control of Matisse," and Matisse had been dissolved, there were no such documents.  Of course, this strategy ignored the judgment

finding SPIB to be the alter ego of Matisse.  Texas counsel concluded the result of the discussed strategies would delay the bankruptcy filing until at least September 15, 2010.

### GG.   SPIB Bankruptcy Filing.

SPIB filed its Chapter 7 bankruptcy case October 29, 2010.  David Lewis ("Trustee") was duly appointed as the Chapter 7 trustee.

### HH.   Adversary Proceeding.

On October 29, 2012, Trustee filed the instant adversary proceeding against Bagley, Takacs, Jackson, and eighteen corporate entities, asserting claims for recovery of fraudulent transfers under 11 U.S.C. §§ 548 and 544[5] and the Colorado Uniform Fraudulent Transfer Act ("CUFTA"); breach of fiduciary duty; and alter ego-veil piercing. The adversary proceeding was stayed for a period while Trustee obtained approval of an agreement regarding the prosecution of the estate's claims (Order entered July 2, 2014, docket #36 in case #10-37635).

The Court denied Defendants' Motions to Dismiss on December 12, 2014, and Trustee filed his Amended Complaint (docket #39) on January 16, 2015.  Defendants, alone or in various combinations, filed motions seeking summary judgment, in whole or in part (docket ##70, 80, 81, 82, 83, 85, 86, 87, 88, 89, 90, and 91).  By Orders entered in June of 2016, this Court granted two of the motions (docket #127, granting docket #80; and docket #129, granting docket #86), dismissing Trustee's claims against eight Defendants. On September 29, 2017, the Court granted in part summary judgment in favor of Takacs (docket #70), to the extent Trustee sought to avoid under § 548 any transfers that took place more than two years prior to Debtor's petition date, and denied the motion in all other respects; and granted summary judgment as to all remaining Defendants to the extent Trustee sought to avoid under § 548 any transfers that took place more than two years prior to Debtor's petition date (docket #85), and denied their motions in all other respects (docket #138).

The case was called to trial on May 21, 2018, and Trustee presented evidence on his remaining claims against Defendants Bagley, Takacs, Jackson, Princeton Partners, HLSP Investment Banking, LLC, Stone Pine Advisors, LLC, HLPEF/SP Management, LLC, Stone Pine Accounting Services, LLC, The Stone Pine Companies, and American National Security Management, LP.  The parties submitted Stipulated Facts on May 14, 2018 (docket #174).  At the conclusion of the evidence, Plaintiff entered into a settlement with Defendant Stone Pine Accounting Services, LLC (Docket #51).

At the end of the trial, the following defendants remained in the case: Bagley, Takacs, Jackson, HLSP Investment Banking, HLPEF/SP Management, Princeton Partners, and ANSM.

---

[5] Unless otherwise specified, all references to the Bankruptcy Code or to Sections herein are to 11 U.S.C. § 101, *et seq.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

III.   **DISCUSSION**

   A.   **Credibility and Intent.**

   Before discussing the substance of Trustee's claims, the Court makes the following findings regarding witness credibility.  In some respects, Defendants' testimony was consistent with contemporaneously-prepared documents and was, therefore, more credible.  But, in many instances, Defendants' testimony, particularly Bagley's, was not consistent with contemporaneously-prepared documents, and in those instances the Court places much more weight on the contemporaneously-prepared documents.  In some instances, such as with Bagley's father's purchase of Fortune stock, the documents were inconsistent with each other, which reduces Bagley's overall credibility.  The Court found Bagley's emails and testimony to have the most inconsistencies, and found Bagley to be particularly lacking in credibility.

   Defendants argue Takacs acted alone, and the business deals he initiated had nothing to do with the parties' prior business deals.  The Court disagrees.  Takacs, Bagley, and Jackson acted together at all relevant times (Jackson working primarily with Bagley, and Bagley working with both Jackson and Takacs).  Takacs did not leave Stone Pine entities and strike out on his own; he was working with Stone Pine entities the entire time.  His work for Pacific USA was pursuant to a contract between Pacific USA and Matisse, a Stone Pine entity.  Pacific USA paid Matisse for Takacs's services throughout the contract term.  Takacs continued to hold himself out as a Director of the Stone Pine Companies.  He used Stone Pine mailing and email addresses.  He solicited business opportunities, including Transportech, Nomura, Moneda, TechFund, and Fortune, on behalf of Stone Pine entities.  He sought and obtained expense reimbursements from Stone Pine entities.  He worked with Bagley to develop deals on behalf of Stone Pine entities.  Some deals were treated as Stone Pine deals.  Those that were not treated as Stone Pine deals would have been, but for diversions made by Bagley, Takacs, and Jackson.

   The parties responded to the entry of the ART Federal Judgment by moving assets out of Matisse and later out of SPIB, favoring claims of insiders, which in many cases were not legitimate claims.  For example, loans made by and repaid to Bagley bore no indicia of arms' length deals, such as notes payable with fixed terms.  The loan amounts and terms changed to fit the parties' needs at the time.[6]  The Court finds from at least January 2005 forward, the parties worked together with a specific purpose and intent of hindering, delaying, and defeating ART's efforts to collect its judgment.  Bagley, Takacs, and Jackson are each responsible for contributing to decisions to transfer funds away from Stone Pine entities and into their own pockets.

---

[6] *See, e.g.,* Exhibit 199, a memo from Jackson to Bagley noting SPIB's loan that allowed Bagley to purchase Hamilton Lane stock was initially treated as a non-interest-bearing loan, but was later changed to interest-bearing, and various payments to and from Bagley were treated, after-the-fact, as loans and interest payments rather than increases or decreases of a capital account.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

#### B.    Fraudulent Transfer Claims.

As the party asserting fraudulent transfer claims, Trustee has the burden of proving each element by a preponderance of the evidence. *Fitzgibbons v. Thomason (In re Thomason)*, 202 B.R. 768, 771 (Bankr. D. Colo. 1996), *cited in Bullseye Holdings, LLC v. IRS (In re Bullseye Holdings, LLC)*, Adv. No. 4:16-ap-00449-BMW, 2018 WL 4998089, at *6 (Bankr. D. Ariz. Oct. 15, 2018) (applying Colorado law).

#### 1.    Transfers of an Interest in Property of Debtor.

Before determining whether any transfers were fraudulent, the Court must first determine whether any transfers of an interest in property of Debtor were made. Trustee has identified the following as fraudulent transfers: (1) the transfer of the Nomura, Moneda, and TechFund deals to HLSP Holdings and to Fortune in July 2005; (2) the transfers of funds received in the PEMG Payout in May and September 2006;[7] (3) the Identified Transactions, which were made in 2007; and (4) the transfer of HLPEF/SP to ANSM in April 2008. With respect to the Fortune transfers and PEMG Payout funds, Defendants argue the transfers were not property of SPIB. The Court disagrees, turning first to PEMG.

PEMG was a Takacs-initiated private equity asset management opportunity that was consummated through a SPIB-owned entity, HLSP IB. Pursuant to the parties' contract, Bagley provided consulting services, and PEMG paid HLSP IB. HLSP IB transferred those funds to SPIB, and SPIB recognized those payments as SPIB income on its financial statements and tax returns. In 2006, when the parties negotiated a payout of the remainder of the contract, the funds paid to HLSP IB should have been transferred to SPIB and recognized as SPIB income, just as the prior payments had been. Instead, Bagley and Jackson diverted the funds to themselves (in Bagley's case, to his family partnership Princeton Partners). The Court finds SPIB had a sufficient interest in the funds included in the PEMG payout that the transfers of the funds from HLSP IB to Princeton Partners and to Jackson should be considered transfers of SPIB funds.

Nomura, Moneda, TechFund, and Fortune were also Takacs-initiated private equity asset management opportunities. Defendants portray Takacs as a lone wolf, acting on his own to develop those opportunities. The Court disagrees. Just as he had done with PEMG, and as part of his work as a Managing Director of the Stone Pine Companies, using a Stone Pine mailing and email address, Takacs identified business opportunities and presented them to Bagley so those opportunities could be realized, ideally with the help of Hamilton Lane (as in the case with PEMG). The deals were

---

[7] Defendants assert Trustee did not plead a claim to avoid the PEMG payout transfers, and those transfers cannot now be avoided as fraudulent. The Court is not persuaded. Rule 15 of the Federal Rules of Civil Procedure, incorporated in adversary proceedings by Fed. R. Bankr. P. 7015, permits amendment after trial to conform to the evidence, particularly in cases where there is no surprise to the opposing party. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1231 (10th Cir. 2017). Here, the issues were discussed both at summary judgment and at trial, and evidence relating to the transfers was admitted by stipulation. The Court finds no prejudice. Amendment under Rule 15 should be "liberally granted," and the Court finds amendment appropriate in this case.

obtained because the deal counterparties understood they were dealing with Stone Pine entities, and Stone Pine entities had a track record of success, including HLSP IB.  It was no accident the TechFund and Nomura letters of intent and the Fortune press releases specifically mentioned HLSP IB, and the entity formed to accomplish the deals was also named HLSP.  Having obtained business by a Stone Pine connection, the Defendants cannot now deny the Stone Pine connection.

Defendants argue SPIB had no potential ownership in the deals because SPIB focused on traditional investment banking.  The Court appreciates there may be a distinction between traditional investment banking and private equity asset management, but that distinction was not observed in practice with SPIB.  SPIB was involved with traditional investment banking, turnaround investment banking (for Pacific USA and for ART, through Matisse), and private equity asset management (through HLSP IB, and through SPAM, which became HLPEF/SP Management, which was owned in part by SPIB).  SPIB received much of its income from, and paid expenses of, deals that were in the nature of private equity asset management.  Just as the PEMG deal was placed in SPIB-owned entity HLSP IB, the Nomura, Moneda, and TechFund deals should have been placed in SPIB-owned entities, and the Fortune deal should have been accomplished with a SPIB-owned entity, and they would have been, but for the diversions of Bagley, Takacs, and Jackson.

Defendants further argue SPIB did not have the ability to bring the Nomura, Moneda, and TechFund deals to fruition on its own.  Of course, the deals originally contemplated the participation of Hamilton Lane; they were not expected to be SPIB-only deals.  The participation of Hamilton Lane or any other entity does not remove the deal from SPIB (Hamilton Lane participated in PEMG), nor does the lack of participation of Hamilton Lane or any other entity remove the deal from SPIB.  Defendants further argue the deals did not prove successful, even with the participation of Fortune.  But, the subsequent failure of the deals does not change their value at the time they were sold to Fortune.

SPIB paid development expenses for the Nomura, Moneda, and TechFund deals, and paid expenses for the Fortune sale.  The parties' contemporaneous documentation characterized the expenses as those of Stone Pine in general, and SPIB in particular.  For example, Bagley characterized his London trip expenses as "SPIB – Fortune."  Defendants' closing argument asserts Bagley was just doing "due diligence" on behalf of SPIB.  Docket 245 at 9.  Why would SPIB have had a need for due diligence if it had no connection with the deal?  If it were truly an opportunity belonging only to Takacs individually and Bagley individually, Bagley should have funded his own due diligence.  SPIB paid the expenses because the parties understood and intended the deals to be SPIB deals.  The Court finds SPIB had a sufficient interest in the Nomura, Moneda, TechFund, and Fortune deals that the transfers are appropriately considered property of SPIB.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Finally, the Court is mindful that the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), Colo. Rev. Stat. §§ 38-8-105 and 38-8-106, provides an equitable remedy. As the U.S. District Court for the District of Colorado explained:

> The purpose of a court sitting in equity is to promote and achieve justice with some degree of flexibility; in other words, the court is to examine substance over form. *Garrett v. Arrowhead Imp. Ass'n*, 826 P.2d 850, 855 (Colo. 1992); *see also Rocky Mountain Gold Mines v. Gold, Silver & Tungsten*, 93 P.2d 973, 982 (Colo. 1939) ("Equity . . . has to do with the substance and reality of a transaction – not the form and appearance which it may be made to assume. . . . [I]t is the real intention of the parties, and the true nature of the transaction that concern equity; . . . no matter how many papers may have been executed that cover up the real purpose and give to the transaction an appearance other than the true one.").

*United States v. Wilhite*, Case no. 00-cr-0004-CMA-MEH, 2016 WL 5720707, at *7 (D. Colo. June 23, 2016).

Trustee has sufficiently shown transfers of Debtor's property.  The Court next turns to the statutory requirements for avoidance of the transfers.  The Court will discuss separately (1) the elements of the CUFTA claims under Colo. Rev. Stat. §§ 38-8-105 and 38-8-106, and (2) Defendants' defense based on the statute of limitations.

### 2.      Elements of CUFTA claims.

Trustee asserts claims under three sections of CUFTA:  Colo. Rev. Stat. § 38-8-105(1)(a), which applies to transfers made with actual fraudulent intent; Colo. Rev. Stat. § 38-8-105(1)(b), which applies to transfers made for less than reasonably equivalent value; and Colo. Rev. Stat. § 38-8-106(2), which applies to transfers made to insiders while Debtor was insolvent.  The Court will begin with Colo. Rev. Stat. § 38-8-105(1)(a).

### a.      Colo. Rev. Stat. § 38-8-105(1)(a).

Colorado Revised Statute § 38-8-105(1)(a) provides, in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Colo. Rev. Stat. § 38-8-105(1)(a).  In determining actual intent, the Court may consider the following factors:

> (a)      The transfer or obligation was to an insider;

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

(b)    The debtor retained possession or control of the property transferred after the transfer;

(c)    The transfer or obligation was disclosed or concealed;

(d)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e)    The transfer was of substantially all the debtor's assets;

(f)    The debtor absconded;

(g)    The debtor removed or concealed assets;

(h)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Colo. Rev. Stat. § 38-8-105(2).  The Court will discuss each in turn.

Regarding the first factor, the Court finds the transfers were made to insiders. Specifically, the Nomura, Moneda, and TechFund deals were transferred to HLSP Holdings, a corporation owned in vast majority and controlled by Takacs, Bagley, and Jackson, and the Fortune stock was distributed to Takacs, Bagley, and Jackson individually.[8]  The funds received in the PEMG Payout were paid to Bagley and Jackson individually.  When some of those funds were deposited into SPIB, the transfers made from SPIB were then paid to insiders such as Bagley, FCM Fiduciary Capital Management Company (a Bagley owned and controlled entity), Ray Redfern for painting (a Bagley personal expense), and the U.S. Treasury for Bagley's personal taxes.  The Identified Transactions were made to insiders, including Bagley, the U.S. Treasury on behalf of Defendants, SPAS, HLPEF/SP Management, and Bagley's wife, Kathleen Bagley.  And, the sale of HLPEF/SP to ANSM was made to an insider, as ANSM was majority owned and controlled by Bagley.  The first factor favors a finding of fraudulent intent.

Regarding the second factor, Debtor did not retain possession or control of the property transferred, although its insiders did.  This factor neither favors nor contradicts a finding of fraudulent intent.

Regarding the third factor, the transfers were not disclosed.  Defendants point to the press releases issued in connection with the Fortune closing, but those press releases only give notice of the deal itself.  The press releases do not state the deal flow was transferred to Puerto Rican entity, and the Fortune stock was given to shareholders individually.  A disclosure that omits information that would reveal the fraudulent nature of the transaction does not provide sufficient notice of the transaction.  Further,

---

[8] Transfers to Bagley's family partnership, Princeton Partners, are treated as transfers to Bagley personally.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Defendants ignored, delayed, and provided evasive and incomplete responses to ART's post-judgment discovery. The third factor favors a finding of fraudulent intent.

Regarding the fourth factor, ART had sued Matisse, Takacs, and Bagley in the Texas Federal Court Case, and by 2005, judgment had been entered in favor of ART. In 2006, ART sued SPIB and other defendants as well. Contemporaneous emails compel a conclusion the Defendants, and in particular Bagley and Jackson, embarked on a course of action designed to clear assets out of Matisse and out of SPIB, and into the hands of insiders. This factor strongly supports a finding of fraudulent intent.

Regarding the fifth factor, the cumulative effect of the transfers was to deplete all of SPIB's assets, leaving an empty shell. Bagley and Jackson intentionally structured the PEMG payout and transfer of HLPEF/SP to ANSM in order to reduce assets otherwise available in SPIB. The Fortune-related transactions, including Bagley's and Takacs's signing agreements to conduct all future deals through Fortune, killed any hope SPIB may have had at earning future business. And the Identified Transactions, totaling $529,256.24, left SPIB with a bank balance of only $3,769. By the time it filed its bankruptcy petition, SPIB had no cash and no bank accounts. This factor supports a finding of fraudulent intent.

Regarding the sixth factor, SPIB did not abscond. This factor does not support a finding of fraudulent intent.

Regarding the seventh factor, the Court finds SPIB's assets were transferred away from or out of SPIB, and to individuals, in a manner that was concealed from SPIB's creditors, particularly ART. This factor supports a finding of fraudulent intent.

Regarding the eighth factor, the Court finds SPIB did not receive reasonably equivalent value for the transfers. SPIB received no value for the Nomura, Moneda, TechFund, and Fortune deals. SPIB did not receive income from the PEMG Payout; instead the funds deposited into SPIB were treated as Bagley's and Jackson's capital contributions and were then further distributed to insiders. Thus, SPIB did not receive reasonably equivalent value from the PEMG payout. The Court cannot find SPIB received reasonably equivalent value for the Identified Transactions paid to Bagley, his wife, or the U.S. Treasury on his behalf, because the Court does not find Bagley has proven the amounts owed to him to be legitimate debt. Those payments were initially treated as accounts receivable owed by Bagley, and the Court adopts that characterization. And finally, SPIB did receive some value from the transfer of HLPEF/SP to ANSM, but the Court does not find the value to be reasonably equivalent because the Court does not find the $90,000 offset against SPIB's interest in ANSM (from cash advances treated as loans) to be legitimate debt. This factor supports a finding of fraudulent intent.

Regarding the ninth factor, at all times since year-end 2003, SPIB has been balance sheet insolvent. SPIB was insolvent at all times material to the Nomura, Moneda,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

TechFund, and Fortune deals, the PEMG Payout, the Identified Transactions, and the transfer of HLPEF/SP to ANSM.  This factor supports a finding of fraudulent intent.

Regarding the tenth factor, the transfer occurred after the entry of the ART Federal Judgment, a substantial debt of SPIB's wholly-owned entity Matisse, which was subsequently found to be an alter ego of SPIB.  This factor supports a finding of fraudulent intent.

Regarding the eleventh factor, there were no transfers to a lienor, but the Fortune transaction represented a transfer of SPIB's assets to HLSP Holdings, then to Fortune, with the consideration transferred to the individual stockholders.  This factor, to the extent applicable, supports a finding of fraudulent intent.

In addition to the factors set forth in the statute, the Court has considered the contemporaneous documentation of the transfers and the parties' emails, which evidence a clear intent to hinder, delay, and defeat ART's attempts to collect the amounts owed. The Court finds the evidence requires a conclusion Bagley, Takacs, and Jackson acted with fraudulent intent required for liability under § 38-8-105(1)(a).

### b.    Colo. Rev. Stat. § 38-8-105(1)(b).

Colorado Revised Statute § 38-8-105(1)(b) provides, in relevant part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (I) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (II) [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Colo. Rev. Stat. § 38-8-105(1)(b).

Given the Court's finding of fraudulent intent, the Court need not reach whether the transfers were made for less than reasonably equivalent value.  But, as discussed above, the Court finds SPIB did not receive reasonably equivalent value for the transfer of the Nomura, Moneda, TechFund, and Fortune deals; the transfers of funds received in the PEMG Payout; the Identified Transactions paid to Bagley, his wife, or the U.S. Treasury on his behalf; or the transfer of HLPEF/SP to ANSM.  And, as discussed above, at all relevant times SPIB was insolvent, and Bagley and Jackson well understood SPIB had no ability to pay its debts as they became due.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

### c.      Colo. Rev. Stat. § 38-8-106(2).

Colorado Revised Statute Section 38-8-106(2) provides, in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Colo. Rev. Stat. § 38-8-106(2).

Given the Court's finding of liability under Colo. Rev. Stat. § 38-8-105(1), the Court need not reach whether the transfers were made for less than reasonably equivalent value.  But, as discussed above, the Court finds SPIB did not receive reasonably equivalent value for the transfer of the Nomura, Moneda, TechFund, and Fortune deals; the transfers of funds received in the PEMG Payout; the Identified Transactions paid to Bagley, his wife, or the U.S. Treasury on his behalf; or the transfer of HLPEF/SP to ANSM. And, as discussed above, at all relevant times SPIB was insolvent.

### 3.      Statute of Limitations.

CUFTA sets forth the following statute of limitations:

(1)      A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:

      (a)      Under section 38-8-105(1)(a), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

      (b)      Under section 38-8-105(1)(b) or 38-8-106(1), within four years after the transfer was made or the obligation was incurred; or

      (c)      Under section 38-8-106(2), within one year after the transfer was made or the obligation was incurred.

Colo. Rev. Stat. § 38-8-110.  The statute provides for tolling in cases of transfers made with fraudulent intent, avoidable under Colo. Rev. Stat. § 38-8-105(1)(a).  *See United States v. Kwai Fun Wong*, 575 U.S. 402, 407-08 (2015) (statutes of limitation are presumptively subject to equitable tolling); *Lewis v. Taylor*, 375 P.3d 1205 (Colo. 2016) (Colo. Rev. Stat. § 38-8-105(1)(a) includes a statute of limitations that can be tolled).  The statute does not provide tolling for transfers under Colo. Rev. Stat. § 38-8-105(1)(b) or Colo. Rev. Stat. § 38-8-106(2).  The Court, therefore, finds those causes of action expired prepetition.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

For causes of action under Colo. Rev. Stat. § 38-8-105(1)(a), the extent of tolling available depends on whether Trustee is proceeding under 11 U.S.C. § 544(a), with the powers of a hypothetical creditor, or 11 U.S.C. § 544(b), as an actual, unsecured creditor in Debtor's bankruptcy case. Trustee has asserted both. The Court will discuss each section separately.

### a.    11 U.S.C. § 544(a).

Section 544(a) of the Bankruptcy Code provides:

(a)    The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
   (1)    a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
   (2)    a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
   (3)    a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a).

Trustee argues the statute starts to run when the hypothetical creditor extends credit, at the beginning of the case. In that case, the cause of action cannot be time-barred. Tenth Circuit authority supports Trustee's position. In *Wing v. Dockstader*, 482 Fed. Appx. 361, 364-365 (10th Cir. 2012), the court held the statute of limitations did not run until the receiver's appointment, so a claim brought within one year of appointment was timely filed.[9] Other courts have found the statute of limitations does not start to run until the beginning of a bankruptcy case. *See, e.g., In re Southwest Supermarkets, LLC*, 325 B.R. 417, 426-27 (Bankr. D. Ariz. 2005). Accordingly, Trustee's claims were timely filed.

---

[9] Unlike a claim brought in a state court receivership action, here, under 11 U.S.C. § 546, Trustee had two years from commencement of the case to bring an otherwise-timely-filed claim. There is no question Trustee's Complaint was filed within that deadline.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

Even if the Court did not accept Trustee's position that the statute did not run until the beginning of the case, the Court would nevertheless find equitable tolling applicable. Equitable tolling is appropriate "where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner." *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996), *quoted in Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1220 (10th Cir. 2000). "The principle underlying equitable tolling [for wrongful concealment] is that a person should not be permitted to benefit from his or her own wrongdoing." *Chasteen*, 216 F.3d at 1220. Here, the Court finds a hypothetical creditor could not have discovered the fraudulent transfers prior to the bankruptcy filing because they were concealed, and the Defendants participated in a wrongful scheme to evade discovery obligations, delay the Texas State Court appeal, and delay the bankruptcy filing for the specific purpose of avoiding the statute of limitations.

Defendants argue the Fortune press releases were sufficient to put a reasonable creditor on notice of the transactions. The Court disagrees. A press release does not provide the same amount of notice as a real property transfer recorded in the appropriate jurisdiction. *Cf. Soc'y of Lloyd's v. Lee*, Case no. 06-cv-01508-WYD-BNB, 2007 WL 2126381, at *3 (D. Colo. July 23, 2007) (recorded real property transfer provided sufficient notice to reasonable creditor). But even if a reasonable creditor is charged with receiving notice of press releases, the Court finds the information contained in the Fortune press releases was not sufficient to place a reasonable creditor on notice of the fraudulent nature of the transaction.

In order to provide notice that starts the statute of limitations, the notice must reveal the fraudulent nature of the transaction. *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F.Supp.2d 301, 307 (E.D. Pa. 2011) (applying majority rule), *followed by Official Committee of Unsecured Creditors of Great Lakes Quick Lube LP v. Theisen*, 384 Wisc. 2d 580, 596 (Wisc. Ct. App. 2018); *see also Fid. Nat. Title Ins. Co. of New York v. Howard Sav. Bank*, 436 F.3d 836, 840 (7th Cir. 2006) ("But this just means that the mere fact of a transfer of funds to which one has a claim does not trigger a duty of investigation and thus start the limitations period running; there must be something fishy about the transfer."). Here, a reasonable creditor viewing the Fortune press releases would not have understood the business transaction was conducted through a Puerto Rican entity separate from the Stone Pine entities referenced in the press releases; nor would a reasonable creditor have understood the consideration paid for the transfer, Fortune stock, was distributed to the individuals rather than to the Stone Pine entities otherwise entitled to the consideration. A reasonable creditor would not have known something was "fishy" about the structure of the Fortune deal. Therefore, the Fortune press releases did not provide sufficient notice to start the running of the statute of limitations.

For each of the above reasons, the Court finds Trustee's CUFTA cause of action, to the extent brought under 11 U.S.C. § 544(a), did not expire prepetition. Trustee timely filed his complaint under 11 U.S.C. § 546. The transfers identified as fraudulent are therefore avoidable under 11 U.S.C. § 550.

## b.    11 U.S.C. § 544(b).

Section 544(b) of the Bankruptcy Code provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of
> an interest of the debtor in property or any obligation incurred by the debtor
> that is voidable under applicable law by a creditor holding an unsecured
> claim that is allowable under section 502 of this title or that is not allowable
> only under section 502(e) of this title.

11 U.S.C. § 544(b).

Under this section, the Court looks to actual creditors, holders of unsecured claims in Debtor's case.  Debtor's Schedule F lists only ART, Debtor's Texas counsel, and insiders ANSM, Princeton Partners and SPAM.  Assuming *arguendo* each is considered to hold an allowable unsecured claim, each had at least the amount of knowledge of ART, which was aware of the transfers by the time of trial in the Texas State Court Case, more than one year before Debtor filed its bankruptcy petition.  But, the Court's analysis does not end there, because the Court must take into account ART's ability to pursue claims in that case.

> The doctrine of equitable tolling applies to periods of limitation in appropriate
> circumstances.  It permits a court to suspend the measuring period for a
> party to take action during the time the party was unable to act. . . .  It
> "permits courts to extend a statute of limitations on a case-by-case basis to
> prevent inequity."  *In re Randall's Island Family Golf Centers*, 288 B.R. 701,
> 705 (Bankr. S.D.N.Y. 2003), *quoting Warren v. Garvin*, 219 F.3d 111, 113
> (2d Cir. 2000), *cert. denied* 531 U.S. 968, 121 S.Ct. 404, 148 L.Ed.2d 312
> (2000).  Equitable tolling has been used when a litigant has actively pursued
> his judicial remedies by filing a defective pleading within the period of
> limitations, or has been induced or tricked by his adversary into permitting
> the deadline to pass.  *Id., citing Young v. United States*, 535 U.S. 43, 122
> S.Ct. 1036, 1041, 152 L.Ed.2d 79 (2002); *Irwin v. Dep't of Veterans Affairs*,
> 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990).

*Tidewater Finance Co. v. Williams (In re Williams),* 333 B.R. 68, 71 (Bankr. D. Md. 2005), *aff'd*, 341 B.R. 530 (D. Md. 2006), *aff'd*, 498 F.3d 249 (4th Cir. 2007).

Here, the Texas State Court limited ART's fraudulent transfer claims to those occurring between September 16, 2002, and January 6, 2005, and also limited the jury's ability to find a fraudulent transfer, instructing the jury to consider the issue of fraudulent transfers only if the jury did not find Matisse to be the alter ego of SPIB.  Because the jury found Matisse to be the alter ego of SPIB, the jury did not decide whether fraudulent transfers were made.  ART preserved its rights to assert those issues by objecting at appropriate times and by pursing those issues on appeal, which appeal was still pending on the date Debtor's bankruptcy petition was filed.  The Court finds the doctrine of

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

equitable tolling applies to extend the statute of limitations during the time ART was prevented from pursuing fraudulent transfers, due to the decisions of the Texas State Court.  Tolling is appropriate in this case because ART did not sleep on its rights; it pursued the Defendants to the fullest extent it could.  It actively pursued judicial remedies within the period of limitations.

The Court finds Trustee's CUFTA cause of action, to the extent brought under 11 U.S.C. § 544(b), did not expire prepetition.  Trustee timely filed his complaint under 11 U.S.C. § 546.  The transfers identified as fraudulent are therefore avoidable under 11 U.S.C. § 550.

### 4.    11 U.S.C. § 550.

Section 550 of the Bankruptcy Code provides, in relevant part:

(a)    Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
   (1)    the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
   (2)    any immediate or mediate transferee of such initial transferee.
(b)    The trustee may not recover under section 1 (a)(2) of this section from—
   (1)    a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
   (2)    any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a)-(b).  The Court will discuss each set of transfers in turn.

### a.    Fortune deal.

Regarding the transfer of the Nomura, Moneda, and TechFund deals to HLSP Holdings and to Fortune in July 2005, the Court finds the Nomura, Moneda, and TechFund deals were property of Debtor transferred to HLSP Holdings for the benefit of Takacs, Bagley, and Jackson.  For purposes of 11 U.S.C. § 550, HLSP Holdings was the initial transferee, and Takacs, Bagley, and Jackson were the entities for whose benefit the transfers were made.  The Fortune stock was transferred to HLSP Holdings and subsequently distributed to Takacs, Bagley (through Princeton Partners), and Jackson. Each received Debtor's property.  None has shown he gave value to Debtor.  None acted in good faith in connection with the transfers.  Takacs, Bagley, Princeton Partners, and Jackson are each liable to Trustee for the value each received.

Takacs received 12,313,255 shares of Fortune stock; Bagley received 7,387,953 shares of Fortune stock; and Jackson received 4,925,302 shares of Fortune stock. At the time, Fortune stock was trading at €0.92, and one euro was worth $1.2066, so each share was worth $1.11. Exhibit 326. Contemporaneously with their receipt of the stock, Defendants applied a 50% discount to reflect the stock's restricted status, resulting in a valuation of $0.555 per share. *Id.* The Court finds the 50% discount appropriate to determine value received for purposes of § 550. Thus, the Court finds Takacs received $6,833,856.53 worth of stock; Princeton Partners and Bagley received $4,100,313.92 worth of stock; and Jackson received $2,733,542.61 worth of stock. The Court will enter judgment in favor of Trustee for those amounts.

### b.    PEMG Payout.

On May 23, 2006, PEMG paid HLSP IB the first $900,000. Rather than transfer those funds to SPIB as had been done in the past, Bagley and Jackson transferred the funds to themselves. Bagley's family partnership, Princeton Partners, received $720,000, and Jackson received $180,000. Each received property of SPIB as an initial transferee or as a mediate transferee not acting in good faith, and Bagley was the entity for whose benefit the transfer to Princeton Partners was made. The Court will give each credit for the funds returned to SPIB, $720,000 from Princeton Partners and $144,000 from Jackson, although the funds should have been treated as SPIB income rather than as capital contributions. The difference, $0 for Bagley and Princeton Partners and $36,000 from Jackson, is recoverable under § 550.

On September 1, 2006, PEMG paid HLSP IB the remaining $900,000. Princeton Partners received $712,000, and Jackson received $178,000. Giving Bagley and Princeton Partners credit for $425,600 and Jackson credit for $142,400, the difference, $286,400 for Bagley and Princeton Partners and $35,600 for Jackson, is recoverable under § 550. The Court will enter judgment in favor of Trustee for those amounts.

### c.    Identified Transactions.

From the transfers included in the Identified Transactions, $62,431.74 was paid to SPAS; $80,737.00 was paid to HLPEF/SP Management; $8,000.00 was paid to Bagley's wife, Kathleen Bagley; $161,500.00 was paid to Bagley; and $216,587.50 was paid to the U.S. Treasury on Bagley's behalf. SPAS is no longer a Defendant, so those transfers will not be avoided. But, the Court finds the remaining transfers to be avoidable under § 550.

For the transfers to HLPEF/SP Management, Defendants argue they were repayments of cash advances HLPEF/SP made to SPIB. The Court is skeptical of SPIB's accounting treatment of insiders' claims. But, even if the payments were treated appropriately for accounting purposes, the Court finds the transfers were made with the actual intent to hinder, delay, and defeat ART's ability to collect its debt. *See FPA Creditor Trust v. Gonzaba (In re APF Corp.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (reasonably equivalent value is irrelevant when a transfer was made with actual fraudulent intent).

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

HLPEF/SP is liable as an initial transferee of the transfers.  The Court will enter judgment in favor of Trustee for the amount HLPEF/SP received, $80,737.00.

The Court also finds avoidable the transfers made to Bagley's wife, to Bagley, and to the U.S. Treasury on Bagley's behalf, with the exception of Identified Transaction number 19, a $2,500.00 payment made June 21, 2007, to Bagley.  That transaction appears to be a payment received from another entity, which was passed through SPIB.  As to the remaining transfers, totaling $383,587.50, the Court finds Bagley to be the initial transferee, for those transfers he received directly, or the entity for whose benefit the transfer was made, for those transfers to Kathleen Bagley or to the U.S. Treasury.  The Court does not accept Bagley's characterization of those transfers as payments of legitimate debt.  But, even if the debt were legitimate, the Court would nevertheless find the transfers avoidable because they were made with the actual intent to hinder, delay, and defeat ART's ability to collect its debt.  The Court will enter judgment in favor of Trustee and against Bagley for $383,587.50.

### d.      HLPEF/SP to ANSM.

For its purchase of SPIB's interest in HLPEF/SP, ANSM paid SPIB $180,000, consisting of $45,000 cash, a $90,000 offset against interest on cash advances to SPIB that ANSM had treated as loans, and a $45,000 note receivable, which ANSM subsequently paid in full, with interest.  The Court finds $180,000 to be an adequate price for SPIB's interest, based on the projected revenues of the remaining Hamilton Lane funds at the time.  But, the Court finds ANSM paid only $90,000 for the interest.  The Court does not accept Defendants' assertion that $90,000 was properly offset against interest on cash advances to SPIB.  And, as noted above, a transfer made with actual fraudulent intent is avoidable notwithstanding reasonably equivalent value.  The Court will enter judgment in favor of Trustee and against ANSM, the initial transferee, for $90,000.

### 5.      Conclusion.

For the reasons discussed above, the Court finds Trustee has proven intentional fraudulent transfers, avoidable under Colo. Rev. Stat. § 38-8-105(1)(a), as a representative of creditors under either 11 U.S.C. § 544(a) or § 544(b), with a complaint timely filed under 11 U.S.C. § 546.  Under 11 U.S.C. § 550, Trustee is entitled to recover the following amounts:  (1) from Takacs, the amount of $6,833,856.53, for the value of the Fortune stock; (2) from Bagley, the amount of $4,770,302.42, for the value of the Fortune stock ($4,100,313.92), the PEMG Payout ($286,400.00) and the Identified Transactions ($383,587.50); (3) from Jackson, the amount of $2,805,142.61, for the value of the Fortune stock ($2,733,542.61), and the PEMG payout ($36,000.00 and $35,600.00); (4) from Princeton Partners, the amount of $4,386,713.92, for the value of the Fortune stock ($4,100,313.92) and the PEMG payout ($286,400.00); (5) from HLPEF/SP Management, the amount of $80,737.00, for the Identified Transactions; and (6) from ANSM, the amount of $90,000, for the Identified Transactions.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

### C.    Breach of Fiduciary Duty.

Trustee has asserted claims for breach of fiduciary duty.  The Court finds Trustee lacks standing to bring those claims as a representative of creditors under 11 U.S.C. § 544(a) or (b) because Colorado law does not allow creditors to bring those claims:

> The LLC Act states that managers are not liable for debts of the LLC, and it extends no fiduciary duty to creditors.  §§ 7–80–404, 7–80–705.  The LLC Act on its face does not call for the application of corporation common law in situations other than piercing the corporate veil.  *See* § 7–80–109.  Because the LLC Act does not extend corporation common law to an LLC in any instance except a veil-piercing claim, the court of appeals in *Sheffield* erred in extending the fiduciary duty an insolvent corporation's directors owe its creditors to the managers of an LLC.  To the extent that *Sheffield* holds that an LLC's manager has a fiduciary duty to the LLC's creditors, it is overruled.  Having concluded that *Sheffield* was wrongly decided, we hold that absent statutory authority, the manager of an insolvent LLC does not owe the LLC's creditors the same fiduciary duty that an insolvent corporation's directors owe the corporation's creditors.  Here, the plaintiff, as a creditor . . . , may not assert a claim of breach of fiduciary duty against the defendant managers.

*Weinstein v. Colborne Foodbotics*, LLC, 302 P.3d 263, 269 (Colo. 2013).

Trustee does have standing to bring breach of fiduciary duty claims as a representative of Debtor, under 11 U.S.C. § 541.  But, standing in Debtor's shoes, Trustee is subject to the same defenses as Debtor.  *Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996).

The LLC Act in effect in 2005 set forth the following duties:

(1)    In addition to the duties established elsewhere in this article, the duties that a member in a limited liability company in which management is not vested in managers and a manager owe to the limited liability company include the duties to:

    (a)    Account to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the member or manager in the conduct or winding up of the limited liability company business or derived from a use by the member or manager of property of the limited liability company, including the appropriation of an opportunity of the limited liability company;

    (b)    Refrain from dealing with the limited liability company in the conduct or winding up of the limited liability company business

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

<ol type="a" start="3">
<li value="c">(c)  as or on behalf of a party having an interest adverse to the limited liability company;</li>
</ol>

    (c)  Refrain from competing with the limited liability company in the conduct of the limited liability company business before the dissolution of the limited liability company; and

    (d)  Comply with the provisions of the operating agreement.

Colo. Rev. Stat. § 7-80-404(1) (in 2005).  SPIB's management was vested in a manager, Bagley.  Therefore, the above specified duties applied specifically to Bagley.

   The Court finds Bagley appropriated SPIB's business opportunity when he diverted the Nomura, Moneda, and TechFund deals to HLSP Holdings and when he received the Fortune stock individually, in violation of Colo. Rev. Stat. § 7-80-404(1)(a) and (b).  But, at the time of the Fortune deal, the LLC Act provided:  "All of the members . . . may authorize or ratify, after full disclosure of all material facts, an act or transaction that otherwise would violate any of the duties specified in section § 7-80-404(1)(a) or (1)(b) if the number or percentage is not unreasonable."  Colo. Rev. Stat. § 7-80-108(2)(c)(1)(B) (2005).  All members of SPIB were fully informed of all material facts and authorized or ratified the Fortune transaction.  The Court agrees with Defendants that waiver bars Trustee's claims for breach of fiduciary duty under Colo. Rev. Stat. § 7-80-404(1)(a) or (1)(b).

   The Court further finds by entering into the Fortune deal, including the Employment Agreement, Bagley breached his duty to refrain from competing with SPIB in the conduct of SPIB's business before SPIB's dissolution, in violation of Colo. Rev. Stat. § 7-80-404(1)(c).  While the LLC Act allows for waiver of this duty in an Operating Agreement, *see* Colo. Rev. Stat. § 7-80-108(2)(c)(II), SPIB's Operating Agreement did not provide for waiver of this duty.  Operating Agreement, Exhibit 523.  But, the claim for breach of fiduciary duty is subject to a three-year statute of limitations, *see* Colo. Rev. Stat. § 13-80-101(1)(f), which expired prepetition.

   Trustee relies on the doctrine of adverse domination, an application of equitable tolling in which the statute of limitations is suspended during the period of time culpable defendants remained in control of a company.  *See F.D.I.C. v. Appling*, 992 F.2d 1109, 1116 (10th Cir. 1993).  The doctrine is applied to protect innocent shareholders and corporate receivers.  It is not clear the doctrine would apply to an LLC.  *See Reinbold v. Kohansieh (In re Sandburg Mall Realty Management LLC)*, 563 B.R. 875, 888-89 (Bankr. C.D. Ill. 2017) (declining to apply the doctrine of adverse domination to an LLC).  Even if the doctrine were applicable to LLCs generally, the Court cannot find it applicable here, where every member participated in the transaction.  In cases where a debtor is barred from bringing a claim immediately prior to its bankruptcy filing, that debtor's trustee may not subsequently bring the claim under 11 U.S.C. § 541:

When asserting claims under the authority of 11 U.S.C. § 541, as [Trustee] does in this case, the trustee stands in the shoes of the debtor and "can take no greater rights than the debtor himself had." H.R. Rep. No. 595, 95th Cong., 1st Sess. 368, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323. This means the trustee is "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir.1989) (quoting 2 Collier on Bankruptcy ¶ 323.02[4]); *see also W.F. Pigg & Son, Inc. v. United States*, 81 F.2d 334, 335 (10th Cir. 1936) ("The trustee takes subject to all valid claims, liens, and equities which might have been asserted against the bankrupt.") (interpreting Section 70a of the Bankruptcy Act, the predecessor of 11 U.S.C. § 541). In other words, though this case is brought by a bankruptcy trustee who gains his authority to sue from the United States Bankruptcy Code, [Trustee's] success or failure on the merits is determined as if the debtor entity itself brought the claims at issue under the applicable law.

*Sender v. Simon*, 84 F.3d at 1305. The Court finds SPIB's cause of action under Colo. Rev. Stat. § 7-80-404(1)(c) expired prepetition. Accordingly, the Court will enter judgment in favor of Defendants on Trustee's claims for breach of fiduciary duty.

### D.    Alter Ego.

Trustee has asserted claims based on alter ego. As a threshold matter, the Court finds Trustee has standing to assert alter ego claims as a representative of creditors, under 11 U.S.C. § 544. *See* Colo. Rev. Stat. § 7-80-107(1) (Colorado LLC law allows actions based on common law alter ego doctrines); *Weinstein v. Colborne Foodbotics LLC*, 302 P.3d 263, 266 (Colo. 2013) (creditors may assert claims under § 7-80-107); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987) (trustee is the proper party to bring claims common to all creditors such as alter ego claims); *Hill v. Gibson Dunn & Crutcher, LLP (In re MS55, Inc.)*, No. 06-cv-01233-EWN, 2007 WL 2669150, at *11 (D. Colo. Sept. 6, 2007).

The Court will consider separately (1) whether Defendants that are Stone Pine entities are alter egos of each other or of Debtor, and (2) whether the corporate veil should be pierced to hold Takacs, Bagley, and Jackson individually liable for the Stone Pine entities' debts.

### 1.    Stone Pine Entities.

In considering whether Defendants HLSP IB, HLPEF/SP Management and ANSM are alter egos of each other or of Debtor, the Court takes into account the following factors:

(1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

(4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Phillips v. Englewood Post No. 322 Veterans of Foreign Wars of the United States, Inc.*, 139 P.3d 639, 643 (Colo. 2006). Here, the Court finds each of the three Stone Pine entity Defendants was operated as a distinct business entity, with the three different Defendants involved in separate business deals, having separate income streams, and separate investors. While funds were transferred back and forth between the Defendants and SPIB, the Court cannot find the companies' assets commingled. Funds were tracked separately, with detailed records maintained by SPAS. The Court does not find Bagley or the other individual Defendants misused the corporate form of HLSP IB, HLPEF/SP Management, or ANSM. The entities were not thinly capitalized, and the Court cannot find them to be mere shells. It is not clear their corporate formalities were ignored, and the Court cannot find their assets were used for non-corporate purposes. The Court does not find HLSP IB, HLPEF/SP Management, and ANSM to be alter egos of each other or of SPIB.

## 2. Piercing the Corporate Veil.

In determining whether to hold Defendants Takacs, Bagley, and Jackson individually liable for Debtor's debts, the Court conducts a three-part inquiry:

> First, the court must determine whether the corporate entity is the "alter ego" of the person at issue. Courts consider a variety of factors in determining status as an alter ego, including whether (1) the corporation is operated as a distinct business entity; (2) funds and assets are commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell"; (7) legal formalities are disregarded; and (8) corporate funds or assets are used for non-corporate purposes.

> Second, the court must determine whether justice requires recognizing the substance of the relationship between the person sought to be held liable and the corporation over the form because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim."

> Third, the court must consider whether an equitable result will be achieved by disregarding the corporate form and holding an individual personally liable for the acts of the business entity.

*Lopez v. Next Generation Constr. & Envtl., LLC*, No. 16-CV-00076-CMA-KLM, 2016 WL 6600243, at *2 (D. Colo. Nov. 8, 2016) (citations omitted). The Court considers two

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

relevant time periods:  pre-ART Federal Court Judgment and post-ART Federal Court Judgment.

As to the first time period, the Court finds no evidence Debtor was not operated as a distinct business entity, or funds and assets were commingled with individuals' assets. SPAS maintained adequate corporate records, and the Court finds no misuse of corporate form by Bagley or others.  Debtor was not originally thinly capitalized, and Debtor was not originally used as a mere shell.  The Court finds no evidence of corporate funds or assets used for non-corporate purposes.  Relevant factors do not support a conclusion Debtor was the alter ego of the individual Defendants during the first time period.

As to the second time period, after the Fortune deal closing, SPIB had no active business operations, but it was maintained as a business entity.  Funds were moved often between the Debtor and Bagley (individually and through Princeton Partners).  But, SPAS continued to maintain adequate corporate records on Debtor's behalf.  While the Court finds Bagley, Takacs, and Jackson participated in a scheme to transfer Debtor's assets to other entities and to themselves, those transfers do not rise to the level of ignoring the corporate existence of each entity.  Although it is a close call, the Court finds the relevant factors insufficient to support a conclusion Debtor was the alter ego of the individual Defendants during the second time period.  *Cf. McCallum Family LLC v. Winger*, 221 P.3d 69 (Colo. Ct. App. 2009) (defendant's use of corporate funds for personal purposes, failure to apply business profits to business operations, and general disregard of corporate form satisfied alter ego factors).  The Court specifically finds the factors insufficient to support a conclusion Debtor was the alter ego of Takacs, who had far less control over corporate decisions than Bagley and Jackson.

As to the remaining two factors, the Court does not find Defendants used the corporate fiction to perpetrate a fraud or otherwise evade liability.  The corporate form was appropriately used for the original contract between ART and Matisse.  While the Texas Federal Court Case jury found Bagley to have breached his fiduciary duty to ART, the jury awarded no damages for that breach.  The ART Federal Judgment is a contract-based award for prevailing party attorney's fees, not a tort claim.  Given the availability of more appropriate relief, avoidance of fraudulent transfers, as discussed above, the Court does not find the need for equitable relief under the doctrine of piercing the corporate veil. The Court will enter judgment in favor of all Defendants on Trustee's claims of alter ego and piercing the corporate veil.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds Trustee has proven intentional fraudulent transfers, avoidable under Colo. Rev. Stat. § 38-8-105(1)(a), as a representative of creditors under either 11 U.S.C. § 544(a) or § 544(b), with a complaint timely filed under 11 U.S.C. § 546.  Under 11 U.S.C. § 550, Trustee is entitled to recover the following amounts:  (1) from Takacs, the amount of $6,833,856.53; (2) from Bagley,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 12-01680 KHT

the amount of $4,770,302.42; (3) from Jackson, the amount of $2,805,142.61; (4) from Princeton Partners, the amount of $4,386,713.92; (5) from HLPEF/SP Management, the amount of $80,737.00; and (6) from ANSM, the amount of $90,000.  The Court will enter judgment in favor of all Defendants on Trustee's claims of breach of fiduciary duty as well as alter ego and piercing the corporate veil.  A separate judgment will enter.

　　　　IT IS SO ORDERED.

Dated this 14th day of April, 2020.　　　　BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge