**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-1372-WJM,
*Consolidated with Civil Action Nos. 20-cv-1395-WJM, 20-cv-1723-WJM, 20-cv-1724-WJM*

(Bankruptcy No. 10-37635-KHT)

IN RE:

STONE PINE INVESTMENT BANKING, LLC,

      Debtor.
_____

(Adv. Pro. No. 12-01680-KHT)

JACK TAKACS,

      Appellant,

v.

DAVID E. LEWIS, as Chapter 7 Trustee
for STONE PINE INVESTMENT BANKING, LLC,

      Appellee.

---

**ORDER AFFIRMING DECISION OF BANKRUPTCY COURT**

---

      This matter comes before the Court on four bankruptcy appeals brought by Appellant Jack Takacs ("Takacs") and by Paul Bagley, Donald Jackson, HLPEF/SP Management, LLC, Princeton Partners, and American National Security Management, LP ("ANSM") (collectively, "Appellants"), as well as cross-appeals filed by David E. Lewis, as Chapter 7 Trustee for Stone Pine Investment Banking, LLC (the "Trustee").

      Also before the Court are the Motion of Defendant/Appellant Jack Takacs to

Strike Appellee's Cross-Appeal from Bankruptcy Court's June 5, 2020 Order ("Motion to Strike Cross-Appeal") (ECF No. 15) and the Appellants' Motion to Strike Appellee's Appendix Entry ("Motion to Strike Appendix Entry") (ECF No. 46).

For the reasons explained below, this Court affirms the Bankruptcy Court's rulings, denies as moot the Motion to Strike Cross-Appeal, and grants the Motion to Strike Appendix Entry.

## I. STANDARD OF REVIEW

In reviewing a bankruptcy court's decision, the district court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the Bankruptcy Court's rulings.  28 U.S.C. § 158(a); Fed. R. Bankr. P. 8013.  As the appellate court, the district court has discretion to affirm "on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." *Maldonado v. City of Altus*, 433 F.3d 1294, 1302–03 (10th Cir. 2006) (internal citation and quotation marks omitted).

"In reviewing a bankruptcy court decision we apply the same standards of review as those governing appellate review in other cases."  *In re Perma Pac. Properties*, 983 F.2d 964, 966 (10th Cir.1992) (citation omitted).  A bankruptcy court's legal conclusions are reviewed *de novo*, and factual findings are reviewed for clear error.  *In re Warren*, 512 F.3d 1241, 1248 (10th Cir. 2008).  On mixed questions of law and fact, the Court reviews *de novo* any question that primarily involves the consideration of legal principles and applies the clearly erroneous standard if the mixed question is primarily a factual inquiry.  *In re Wes Dor, Inc.*, 996 F.2d 237, 241 (10th Cir. 1993).

## II. BACKGROUND

**A.    Factual History**

1.    <u>Stone Pine Companies</u>

In 1994, Bagley formed Stone Pine Capital, LLC.  (Appellants' App'x at 1259.)
He and his business partners conducted investment banking and asset management
activities through entities collectively referred to as the "Stone Pine Companies."  (*Id.*)
The entities used common letterhead identifying their common practice, as well as
common business cards, and the domain name: thestonepinecompanies.com.  (*Id.*)

In 1997 and 1998, the Stone Pine Companies were reorganized into three
entities: Stone Pine Investment Banking ("SPIB"), which is the successor in interest to
Stone Pine Capital, LLC; Stone Pine Asset Management ("SPAM"), which later changed
its name to HLPEF/SP Management; and Stone Pine Administrative Services, which
later became Stone Pine Accounting Services ("SPAS").  (*Id.*)

From 2000 until 2006, the various Stone Pine entities used a common office
address, the same telephone number, and a joint receptionist.  (*Id.* at 1261.)

By late 2000, SPIB had the following ownership: Princeton Partners, a general
partnership owned by Bagley and his wife, owned 40%; Takacs owned 40%; and
Jackson owned 20%.  (*Id.* at 1260.)  Bagley was SPIB's sole manager.  (*Id.*)

2.    <u>Takacs and Matisse Capital Partners</u>

Takacs was hired to work on transactions and to originate new business
opportunities for one or more of the Stone Pine entities.  (*Id.*)  He used business cards
identifying himself as a Managing Director of the "Stone Pine Companies."  (*Id.*)

Matisse Capital Partners ("Matisse") was formed as a wholly-owned subsidiary to
provide restructuring services to companies.  (*Id.*)  Takacs was Matisse's initial

3

manager, and Jackson served as Matisse's Chief Financial Officer. (*Id.*)

In 1998, Matisse and Pacific USA Holdings entered into an agreement whereby Takacs, acting on behalf of Matisse, provided financial consulting and advising services to Pacific USA. (*Id.*) Pacific USA paid Matisse for those services, and, in turn, it transferred the payments to SPIB. (*Id.*)

3.   Matisse's Agreement with American Realty Trust, Inc.

On April 13, 2000, Matisse entered into a Financial Consulting Agreement with American Realty Trust, Inc. ("ART"), whereby ART agreed to pay Matisse $200,000 per month and Bagley agreed to be named as Chief Executive Officer and Chairman of the Board of ART's Board of Directors. (*Id.*) Takacs was named as a Managing Director – Strategic Development for ART. (*Id.*)

However, shortly after Matisse and ART signed the Financial Consulting Agreement, two executives of ART's management company (Gene Phillips and Cal Rossi) were indicted on securities fraud charges. (*Id.*) The publicity surrounding their indictment caused ART's stock price to drop, which led ART's lenders to make margin calls. (*Id.*) In response, Phillip's son led an effort to obtain forbearance agreements from ART's lenders. (*Id.*)

Nonetheless, Bagley, assisted by Takacs, negotiated a letter of intent with a large institutional investment fund containing a no-shop clause that precluded forbearance agreements. (*Id.*) Bagley concealed this letter of intent from ART until after it was executed. (*Id.*) When the rest of ART's board of directors learned of the letter of intent, it terminated Bagley from his CEO and board chair positions and terminated the Financial Consulting Agreement with Matisse. (*Id.*)

4.     ART Lawsuit

On June 26, 2000, ART sued Matisse, Bagley, and Takacs in Texas state court for breach of the Financial Consulting Agreement and breach of their fiduciary duties. (*Id.* at 1261.) The case was removed to federal court and, in August 2002, a jury found: (1) in favor of ART on its breach of contract claims against Matisse, Bagley, and Takacs; (2) in favor of ART on its breach of fiduciary duty claims against Matisse and Bagley; and (3) against Matisse on its breach of contract counterclaim. (*Id.*) However, the jury awarded no damages.

In September 2002, the United States District Court for the Northern District of Texas entered judgment notwithstanding verdict in favor of Matisse, Bagley, and Takacs, and awarded Matisse a judgment against ART for $4.4 million, plus prejudgment interest of $624,821.91. (*Id.*)

On December 17, 2003, the United States Court of Appeals for the Fifth Circuit affirmed the district court's holding that Bagley and Takacs could not be individually liable for breach of contract, but it reversed the district court's entry of judgment in favor of Matisse and against ART on the breach of contract claims and the breach of fiduciary claims. (*Id.* at 1263.) The Fifth Circuit then remanded the case for entry of judgment in favor of ART on its breach of contract and fiduciary duty claims, with no damages to be awarded on these claims, but with directions to the district court to consider ART's entitlement to attorneys' fees. *See Am. Realty Tr., Inc. v. Matisse Cap. Partners LLC*, 91 F. App'x 904 (5th Cir. 2003).

On January 13, 2005, the district court entered judgment in favor of ART in the amount of $1,389,226.52 for ART's attorneys' fees and costs, with post-judgment interest on the total amount at the rate of 2.82% (the "ART Federal Judgment"). *See*

5

*Am. Realty Tr., Inc. v. Matisse Cap. Partners LLC*, 2005 WL 81705 (N.D. Tex. Jan. 13, 2005).

     5.    <u>Efforts to Collect on ART Federal Judgment & Texas State Court Case</u>

Matisse's bank account was closed within two weeks of the ART Federal Judgment. (Appellants' App'x at 1264.) In June 2005, Jackson sent Bagley an e-mail stating that they would deliberately not file Matisse's required annual report and allow the Colorado Secretary of State to administratively dissolve Matisse. (*Id.*) Bagley responded, "Absolutely! There hasn't been a peep out of [Gene Phillips of ART] so far." (*Id.* at 1265.)

ART unsuccessfully attempted to collect on the ART Federal Judgment in 2005 and 2006. (*Id.* at 1275.) On July 26, 2006, ART sued Bagley, Takacs, Matisse, Stone Pine Capital, Stone Pine Financial, and SPIB in Texas state court in Dallas County, asserting claims of: (1) fraudulent transfer; (2) common business enterprise and conspiracy; and (3) constructive trust. (*Id.*) ART also sought to enforce its post-judgment discovery, turnover, and attorneys' fees. (*Id.* at 1275–76.)

On July 31, 2009, the jury determined that SPIB was the alter ego of Matisse. (*Id.* at 1280.) On November 11, 2009, the Texas state court entered judgment in favor of ART and against SPIB for $1,389,226.52 plus interest, the amount of the ART Federal Judgment. (*Id.*)

Less than one week later, on November 17, 2009, Bagley reached out to a Colorado bankruptcy attorney and informed that attorney that SPIB had only four creditors: ART, SPIB's counsel in the Texas state action, SPAS, and Bagley. (*Id.*) Because Jackson and Bagley determined that immediately filing for bankruptcy could "let [ART] start over with fraudulent transfer claims out of SPIB," they decided to "get as

much mileage as possible out of [the pending appeal in the Texas state action] and as a result to hold off on the bankruptcy."  (*Id.*)

By May 19, 2010, Bagley and Jackson had closed SPIB's bank accounts.  (*Id.*) Bagley thereafter sent an e-mail to SPIB's bankruptcy attorney, stating:

> Please do not jump the gun on this.  We still intend to file in the near future, however the court process in Texas has been very slow.  Our appeal deadline was just extended again to June 30.
>
> The reason for our delay is that the four year clock has run on several transactions as the appeal process runs.  There are no other creditors pressing SPIB and the plaintiff in our legal case has taken a very slow approach . . . This is an unusual case since no creditors (other than affiliates) will remain unpaid, but for the plaintiff.
>
> . . .

(*Id.* at 1281.)

      6.   <u>Deals</u>

        a.   *PEMG*

While the ART federal lawsuit was pending, Bagley wanted to work with Hamilton Lane—then the largest ERISA fund manager in the United States—to pursue an opportunity to bid on Viventures Partners S.A., a private equity manager and general partner of a large European venture capital fund.  (*Id.* at 1261–62.)  However, because Hamilton Lane's principals wanted to avoid the negative associations from ART's breach of fiduciary duty claims, Bagley and Jackson decided to resurrect a dormant corporate entity to pursue the opportunity: HLSP Investment Banking LLC ("HLSP IB"). (*Id.* at 1262.)  HLSP IB and others acquired a membership interest in Private Equity Management Group ("PEMG"), which, in turn, acquired Viventures Partners S.A.  (*Id.*)

On October 27, 2003, HLSP IB and SPAS entered into a Services Agreement

with Hamilton Lane, and PEMG entered into an Investment Advisory Agreement with HLSP IB, Hamilton Lane, and SPAS.  (*Id.*)  Pursuant to the parties' agreements, Bagley provided consulting services to PEMG; the consulting fees earned by Bagley were paid to HLSP IB, which in turn paid them to SPIB.  (*Id.*)  In 2003 and 2004, PEMG paid HLSP IB $30,000 and $201,296, respectively, which in turn paid SPIB $29,454 and $201,463.  (*Id.*)  SPIB treated these payments as income on its financial statements and tax returns.  (*Id.*)

In 2006, the parties negotiated an early termination of the Investment Advisory Agreement, which provided that HLSP IB would receive $1.8 million as a discounted payout of what was left on the agreement.  (*Id.* at 1274.)  However, when HLSP IB received the funds from PEMG, it did not transfer the funds to SPIB as it had previously done.  Instead, when HLSP IB received the first $900,000 on May 23, 2006, it transferred the funds to Princeton Partners and Jackson according to their ownership interests in HLSP IB: Princeton Partners received 80%, or $720,000, and Jackson received 20%, or $180,000.  (*Id.*)  After receiving these funds, Princeton Partners and Jackson transferred approximately $720,000 and $144,000, respectively, to SPIB.  (*Id.* at 1274–75, 1295.)

On September 1, 2006, PEMG paid HLSP IB the remaining $900,000, which in turn paid $712,000 to Princeton Partners and $178,000 to Jackson.  (*Id.* at 1275.)  Thereafter, Princeton Partners and Jackson transferred approximately $425,600 and $142,400, respectively, to SPIB.  (*Id.* at 1274–75, 1295.)

        b.    *Nomura*

On June 9, 2005, Bagley and Takacs signed a letter agreement on behalf of "HLSP Stone Pine Investment Banking LLC" with Nomura International PLC, a large

Japanese investment firm.  (*Id.* at 1267.)  This letter states:

> We refer to the recent discussions between HLSP Stone
> Pine Investment Banking L.L.C. ("HLSP"), a joint venture
> between Hamilton Lane Advisers and Stone Pine
> Companies, and Nomura International plc ("Nomura" or the
> "Arranger") with respect to HLSP's intention to raise up to
> €1,000,000,000 from debt and equity investors in the form of
> a Collateralised Fund Obligation Issue ("CFO") for
> investment in a diverse portfolio (the "Portfolio") of buy-out
> and venture capital private equity funds (the "Transaction").

> . . .

(*Id.*)

### c.    *Moneda*

Takacs worked with Moneda Asset Management, S.A. ("Moneda"), a private

equity and real estate asset management firm in Chile, to establish a "fund of funds"

directed at Chilean pension fund investors.  (*Id.* at 1270.)

### d.    *TechFund*

On May 11, 2005, Takacs, acting on behalf of "HLSP Hamilton Lane/Stone Pine"

signed a letter of intent addressed to TechFund, setting forth its interest in purchasing

an equity interest of TechFund's management company's private equity division.  (*Id.* at

1265.)  In that letter, Takacs included HLSP's principal contact persons for the

transaction, listing the same physical address used for the Stone Pine Companies and

e-mail addresses at the @stonepinecompanies.com domain.  (*Id.* at 1265–66.)

### e.    *Fortune*

In April 2005, Takacs approached Bagley about a potential deal with Fortune

Management, Inc. ("Fortune"), which was interested in raising funds to acquire other

wealth management companies.  (*Id.* at 1266.)

On May 30, 2005, Fortune's Chief Executive Officer sent Takacs a letter of intent

addressed to Takacs and Bagley at "The Stone Pine Investment Banking L.L.C." at

SPIB's address, stating:

> This Letter of Intent ("LOI") shall outline the general terms and conditions under which FORTUNE Management, Inc. ("Fortune") proposes to acquire 100% of the shares of the shares of Hamilton Lane / Stone Pine Investment Banking HLSP ("HLSP") [check legal form], a joint venture between The Stone Pine Companies ("SPCs") and Hamilton Lane ("HL") . . .

(*Id.*)

### i.   Fortune Press Release

On May 30, 2005, Fortune's CEO drafted a press release that provided:

> Fortune Management, Inc. . . . and Hamilton Lane / Stone Pine Investment Banking (HLSP) have entered into a Letter of Intent.
>
> HLSP is a joint venture between Hamilton Lane, Philadelphia and The Stone Pine Companies L.L.C., Denver, whose principal purpose is the consolidation of private equity management companies on a global basis.  . . .  The companies have agreed to conduct a due diligence in the coming weeks with the objective to reach a definitive agreement in due course.

(*Id.* at 1267.)

In late June 2005, Bagley discussed with Hamilton Lane representatives the

Fortune deal, as well as the Nomura, Moneda, and TechFund deals included in

Fortune's "deal pipeline."  (*Id.* at 1270.)  At the time, Hamilton Lane had not agreed to

participate in any of the deals, including the Fortune deal.  On June 28, 2005, Mario

Giannini of Hamilton Lane learned of the Fortune Press Release and wrote an e-mail to

Bagley, stating:

> Why are you and [Takacs] using Hamilton Lane's name and an entity that we are not a part of and saying we have a joint

> venture in doing this and, worse, doing it in a press release?
> If this is what is being said to Fortune, Nomura, and the
> people in Chile, then I have to tell each of them that it isn't
> true.  What's going on?

(*Id.*)  In his response, Bagley blamed Takacs for the errors and tried to

convince Hamilton Lane to proceed with the deals.  (*Id.*)  Hamilton Lane later agreed to

participate in certain deals, including the Nomura deal.  (*Id.*)

The final press release dated July 8, 2005 stated, *inter alia*:

> The board of Fortune Management Inc . . . has – with
> resolution on July 7, 2005 and following the Letter of Intent
> on June 2, 2005 – decided to acquire the private equity
> business and managing principals of HLSP Holdings Corp.,
> a member of the Stone Pine Group of Companies, Denver,
> in exchange for 33,584,600 restricted shares of Fortune
> common stock.  Primarily, HLSP Holding Corp. comprises of
> a pipeline of private equity transactions in differing stages of
> negotiation.  Such transactions include the acquisition of a
> number of private equity management firms in various
> companies as well as an agreement with a major
> international investment bank for the underwriting of a
> substantial new private equity fund.

(*Id.* at 1272.)

ii.    Fortune Closing and Shares

On July 1, 2005, Bagley entered into a Consulting Agreement with Fortune and

Takacs entered into an Employment Agreement with Fortune.  (*Id.* at 1271.)  On June 7,

2005, the Fortune transaction was finalized, and HLSP Holdings transferred its "Private

Equity Assets"—which included the pending and potential Nomura, Moneda, and

TechFund deals—into a Fortune subsidiary, Fortune Transfer Corp., in exchange for

Fortune common stock.[1]  (*Id.*)  The agreement further required Bagley and Takacs to

---

[1] In an e-mail dated June 19, 2005, Bagley instructed counsel that he wanted to use a
new entity for the Fortune transaction, rather than HLSP, "so as to not contaminate the transfer."
(Appellants' App'x at 1269.)  His attorney responded that he would form a new Delaware
company into which the Hamilton Lane shares and deal pipeline (specifically, the Nomura,

close each of the transactions identified as Private Equity Assets and to "forward and refer all future private equity business opportunities to Fortune and, as the case may be, use his reasonable best efforts to pursue such opportunities on behalf of Fortune," which effectively eliminated any future private equity business opportunities for SPIB. (*Id.*)

Thereafter, Fortune transferred 33,584,600 of Fortune common stock, which were allocated as follows:

| Recipient | Shares of HLSP (if applicable) | Fortune Shares |
|---|---|---|
| Kirkpatrick Lockhart Nicholson & Graham (represented Defendants in Texas Federal Court Case) | n/a | 260,417 |
| Robert Wolin (represented Defendants in Texas Federal Court Case) | n/a | 86,806 |
| Acosta & Ramirez or Juan Acosta | n/a | 50,000 |
| Takacs | 2635 | 12,313,255 |
| Bagley | 1581 | 7,387,953 |
| Jackson | 1054 | 4,925,302 |
| Seiler | 1725 | 8,060,860 |
| Leonard | 107 | 500,007 |

(*Id.*)  As of June 30, 2005, Fortune stock was trading at €0.92, or $1.11.  (*Id.*)

       iii.   <u>Fortune Expenses</u>

Bagley later submitted an expense report for documentation for a trip he took to London between June 8–20, 2005, in which he represented that the purpose of his trip was "SPIB mtg. in London with Nomura (Judith Tan) and Fortune" and that the

---

Moneda, and TechFund deals) would be transferred, and the new company would merge into a Delaware subsidiary of Fortune in exchange for Fortune stock.  (*Id.*)

expenses should be charged to "SPIB – Fortune." (*Id.* at 1268.)

Thereafter, $5,417.23 of SPIB funds were used to pay the Fortune expenses.

(*Id.* at 1273.)  As Bagley explained in an e-mail to Sande Hempelmann of SPAS in

response a question about how to treat one of the expenses:

> This expenditure is for the legal expenses necessary to
> close the sale of HLSP to Fortune.  They are not
> reimbursable by Fortune as the agreement requires each
> parties to bear its own expenses.  SPIB controls HLSP and
> the shares are allocated to Don, Jack and I.  Any accounting
> treatment you think proper is fine with me.

(*Id.*)

7.    Transfer of HLPEF/SP Management Interest to ANSM

HLPEF/SP Management (originally SPAM) was formed in 1998 to focus on

private equity management opportunities.  (*Id.* 1279.)  After its management team left

for Hamilton Lane, HLSPEF/SP became a passive entity holding an interest in

European funds formed by Hamilton Lane.  (*Id.*)  SPIB was entitled to receive 10% of

HLPEF/SP's cumulative net profits, which were estimated to be between $160,000 to

$175,000 in 2008.  (*Id.*)

In early 2008, Bagley and Jackson worked to "formally dissolve as many of the

Stone Pine entities as possible."  (Appellee's App'x at 3240.)  Bagley and Jackson

decided to transfer SPIB's interest in HLPEF/SP Management to ANSM, which was

majority owned and controlled by Bagley.  (Appellants' App'x at 1279.)

In April 2008, ANSM paid SPIB consideration of $180,000, consisting of $45,000

cash, a $90,000 offset against interest on cash advances to SPIB that ANSM had

treated as loans, and a $45,000 note receivable, which ANSM subsequently paid in full,

with interest.  (*Id.*; Appellee's App'x at 3242.)

13

**B.       Procedural History**

SPIB filed for Chapter 7 bankruptcy on October 29, 2010, and David Lewis was

appointed as the Trustee.  (Appellants' App'x at 1282.)

1.       The Adversary Proceeding

On October 29, 2012, the Trustee initiated an adversary action, Case No. 12-

1680, against Bagley, Jackson, Takacs, and 18 corporate entities, asserting claims for

recovery of fraudulent transfers under 11 U.S.C. §§ 548 and 544 and the Colorado

Uniform Fraudulent Transfer Act ("CUFTA"); breach of fiduciary duty; and alter ego-veil

piercing.  (*Id.*)  The Bankruptcy Court ultimately approved an agreement between the

Trustee and ART, whereby ART—SPIB's only creditor—would prosecute the adversary

proceeding.  (*Id.*)

The Trustee identified the following transactions as fraudulent transfers: (1) the

transfer of the Nomura, Moneda, and TechFund deals to HLSP Holdings and to Fortune

in July 2005; (2) the transfers of funds received in the PEMG payout in May and

September 2006; (3) a series of transactions made by SPIB in 2007, including payments

of $383,587.50 to Bagley and $80,737.00 to HLPEF/SP Management; and (4) the

transfer of HLPEF/SP to ANSM in April 2008.  (*Id.* at 1284.)

The Defendants in the adversary proceeding filed motions for summary

judgment.  The Bankruptcy Court granted two of the motions, dismissing the Trustee's

claims against eight defendants and dismissing the Trustee's claims against the

remaining Defendants to the extent that the Trustee sought to avoid under 11 U.S.C.

§ 548 any transfers that occurred more than two years prior to SPIB's filing of its

bankruptcy petition.  (*Id.* at 1282.)

The Bankruptcy Court conducted a bench trial beginning on May 21, 2018.  (*Id.*)

During the course of the trial, the Trustee settled with Defendant Stone Pine Accounting

Services, LLC, such that only the following Defendants remained in the case: Bagley,

Takacs, Jackson, HLSP IB, Princeton Partners, HLPEF/SP Management, and ANSM.

(*Id.*)

On April 14, 2020, the Bankruptcy Court held that the Trustee had proven its

claims for intentional fraudulent transfers under the CUFTA avoidable under 11 U.S.C. §

550 and that the Trustee was entitled to recover: (1) $6,833,856.53 from Takacs (the

value of the Fortune stock that Takacs received); (2) $4,770,302.42 from Bagley

($4,100,313.92 based on the value of the Fortune stock that Bagley received, as well as

$286,400 for the PEMG Payout, and $383,587.50 for the additional fraudulent

transfers); (3) $2,805,142.61 from Jackson ($2,733,542.61 based on the value of the

Fortune stock that Jackson received, as well as other $71,600 for the PEMG Payout);

(4) $4,386,713.92 from Princeton Partners ($4,100,313.92 based on the value of the

Fortune stock that Princeton Partners received, as well as $286,400 for the PEMG

payout); (5) $80,737.00 from HLPEF/SP Management for a series of transfers made

with the actual intent to hinder, delay, and defeat ART's ability to collect on its debt; and

(6) $90,000.00 from ANSM.  (*Id.* at 1301–02.)

The Bankruptcy Court determined that certain of the Trustee's claims were time

barred, but the intentional fraudulent transfer claim was not time barred.  (*Id.* at 1290–

92.)  It further rejected the Trustee's claims for breach of fiduciary duty, alter-ego

liability, and veil piercing.  (*Id.* at 1301.)

On April 28, 2020, the Defendants jointly filed a motion under Federal Rule of

Bankruptcy Procedure 9023 seeking to alter or amend the judgment to limit the

damages to the amount of the claims against the SPIB estate.  (Appellants' App'x at 1305.)  On June 5, 2020, the Bankruptcy Court denied that motion.  (*Id.* at 1455–56.)

2.   The Appeals

On May 13, 2020, Takacs filed a notice of appeal from the Bankruptcy Court's September 29, 2017 Order on Pending Motions for Summary Judgment, July 2, 2018 Order Admitting Additional Exhibits, and the April 14, 2020 Finding of Facts and Conclusions of Law and Judgment.  That appeal was docketed in this Court at Civil Action No. 20-cv-1372.  (ECF No. 1.)

On May 13, 2020, the Appellants filed a notice of appeal from the Bankruptcy Court's July 2, 2018 Order Admitting Additional Exhibits, and the April 14, 2020 Finding of Facts and Conclusions of Law and Judgment.  The Appellants' appeal was separately docketed in this Court as Civil Action No. 20-cv-1395.  The Trustee subsequently filed notices of cross-appeal under both docket numbers.

On June 11, 2020, the Appellants and Takacs filed notices of appeal from the Bankruptcy Court's June 5, 2020 Order on Motion to Alter or Amend.  Those appeals were docketed in this Court as Civil Action No. 20-cv-1723 and No. 20-cv-1724, respectively.  On June 16, 2020, the Trustee filed notices of cross-appeals in both actions.

By order dated July 29, 2020, United States District Judge Robert E. Blackburn consolidated the various appeals.  (ECF No. 10.)

On August 21, 2020, Takacs filed the Motion to Strike Trustee's Cross-Appeal from Bankruptcy Court's June 5, 2020, Order ("Motion to Strike Cross-Appeal").  (ECF No. 15.)

On November 9, 2020, the Appellants and Takacs filed the Motion to Strike

16

Appellee's Appendix Entry ("Motion to Strike Appendix Entry").  (ECF No. 46.)

On November 24, 2020, this Consolidated Action was reassigned to the undersigned.  (ECF No. 57.)

### III. ANALYSIS

### A.    Appeals by Takacs and the Appellants

Takacs argues that the Bankruptcy Court erred in four ways: (1) in determining that the Trustee's claim for intentional fraudulent transfer under Colo. Rev. Stat. § 38-8-105(1)(a) was timely; (2) by failing to utilize the proper standard in analyzing fraudulent transfers; (3) by failing to apply the correct test to determine whether the Fortune Transactions[2] were "property"; and (4) denying as premature Defendants' motion to alter or amend the judgment to limit the amount of the claims asserted against the SPIB estate.  (ECF No. 19 at 2.)

Appellants argue that the Bankruptcy Court erred in eleven ways: (1) by determining that SPIB owned HLSP IB; (2) by determining the PEMG-based claims were timely; (3) by holding Princeton Partners liable for transfers of the Fortune stock; (4) by awarding judgment under 11 U.S.C. § 550 without requiring the Trustee to avoid the transfer of the Fortune Transactions to HLSP Holdings; (5) by concluding that Bagley and Jackson were parties for whose benefit SPIB's transfer of the Fortune Transactions to HLSP Holdings were made; (6) by concluding that the Fortune Transactions were property owned by SPIB; (7) by concluding the transfer of the Fortune Transactions was not time-barred; (8) in its valuation of the Fortune stock; (9) by concluding transfers were made with the intent to hinder, delay, and defraud

---

[2] For brevity, the Court will refer to the Fortune, Nomura, Moneda, and TechFund business ventures collectively as the "Fortune Transactions."

17

creditors; (10) by concluding that SPIB received less than reasonably equivalent value in exchange for the transfers; and (11) by denying as premature Defendants' motion to alter or amend the judgment.  (ECF No. 21 at 4–5.)

      1.    <u>The Fortune Transactions</u>

The Bankruptcy Court concluded that

> [r]egarding the transfer of the Nomura, Moneda, and TechFund deals to HLSP Holdings and to Fortune in July 2005, the Court finds the Nomura, Moneda, and TechFund deals were property of Debtor transferred to HLSP Holdings for the benefit of Takacs, Bagley, and Jackson.  For purposes of 11 U.S.C. § 550, HLSP Holdings was the initial transferee, and Takacs, Bagley, and Jackson were the entities for whose benefit the transfers were made.  The Fortune stock was transferred to HLSP Holdings and subsequently distributed to Takacs, Bagley (through Princeton Partners), and Jackson.  Each received Debtor's property. None has shown he gave value to Debtor.  None acted in good faith in connection with the transfers.  Takacs, Bagley, Princeton Partners, and Jackson are each liable to Trustee for the value each received.
>
> Takacs received 12,313,255 shares of Fortune stock; Bagley received 7,387,953 shares of Fortune stock; and Jackson received 4,925,302 shares of Fortune stock.  At the time, Fortune stock was trading at €0.92, and one euro was worth $1.2066, so each share was worth $1.11.  Exhibit 326.  Contemporaneously with their receipt of the stock, Defendants applied a 50% discount to reflect the stock's restricted status, resulting in a valuation of $0.555 per share.  *Id.*  The Court finds the 50% discount appropriate to determine value received for purposes of § 550.  Thus, the Court finds Takacs received $6,833,856.53 worth of stock; Princeton Partners and Bagley received $4,100,313.92 worth of stock; and Jackson received $2,733,542.61 worth of stock.

(Appellants' App'x at 1294–95.)

      a.    *Judgment Against Princeton Partners*

The Appellants contend that the judgment against Princeton Partners is clearly

erroneous because "[t]here is no evidence that Princeton Partners received or was entitled to Fortune stock at any time."  (ECF No. 21 at 29.)  In response, the Trustee argues that "Princeton Partners is a general partnership and, for all intents and purposes, is Bagley" and that "Bagley indicated in an email that he wanted to hold the Fortune stock in Princeton Partners."  (ECF No. 30 at 8.)

The record is far from clear on this issue.  For example, a July 7, 2005 document entitled "Closing Schedule and Stock Allocation prior to Liquidation" indicates that Bagley would receive 7,387,953 Fortune shares upon the liquidation of HLSP Holding Corp.  (Appellee's App'x at 3178.)  However, in an e-mail dated the prior day, Bagley wrote, "I want to hold my ownership in Princeton Partners if possible."  (Appellee's App'x at 4824.)[3]  Likewise, the exhibit entitled "2007 Fortune Income & Expenses" reflects that numerous wire transfers were made to Princeton Partners.  (Appellee's App'x at 3119.)

Ultimately, the Appellants have not pointed the Court to any evidence in the record demonstrating either that the Fortune stock was transferred to Bagley alone, or that Princeton Partners never held Bagley's Fortune stock.  Without such evidence, Court cannot conclude that the Bankruptcy Court's factual determination on this issue was clearly erroneous.

This portion of Appellants' appeal is therefore denied.

    b.    *Judgment Under 11 U.S.C. § 550(a)(1)*

Section 550 of the Bankruptcy Code provides, in relevant part,

> (a) Except as otherwise provided in this section, to the extent
> that a transfer is avoided under section 544 . . . of this title,

---

[3] In their reply, Appellants contend that "Trustee's Appendix does not have a page 4824, and Defendants have no idea what e-mail he is referring to."  (ECF No. 52 at 57.)  The Court notes that page 4824 does indeed exist.  (*See* ECF No. 36-3.)

the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of the property, from --

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section 1(a)(2) of this section from—

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

> (2) any immediate or mediate good faith transferee of such transferee.

The Appellants argue that the Bankruptcy Court erred in awarding relief under § 550 because: (1) the Trustee failed to avoid the transfer of the Fortune Transactions to HLSP Holdings; and (2) the Appellants received no direct or indirect benefit from the transfer from SPIB to HLSP Holdings and were not "entities for whose benefit the transfer was made."  (ECF No. 21 at 29–30.)  The Court considers each argument below.

> i.   *Trustee's Failure to Sue HLSP Holdings*

The Appellants contend that because Section 550(a) permits recovery only "to the extent that a transfer is avoided," the Bankruptcy Court could only enter judgment against them if the Trustee first avoided the transfer of the Fortune Transactions to HLPS Holdings, the initial transferee.  (*Id.* at 29–30 (citing *In re Slack-Horner Foundries Co.*, 971 F.2d 577, 580 (10th Cir. 1992)).)

In response, the Trustee argues that the Appellants have waived this argument

by failing to raise it below.  (ECF No. 30 at 8–9.)  Appellants neither contest this assertion in their reply nor identify any place in the record where they previously raised this argument before the Bankruptcy Court.  (*See generally* ECF No. 52.)  Given Appellants' failure to respond to the Trustee's waiver argument with case law or citations to the record, the Court finds that Appellants have waived this argument.  *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (internal quotation marks omitted)).

ii.     *Direct or Indirect Benefit From the Transfer*

Appellants next argue that the Bankruptcy Court erred when it entered judgment against Takacs, Bagley, and Jackson "as entities for whose benefit the transfer from HLSP Holdings to Fortune was made."  (ECF No. 21 at 32–33.)  Specifically, the Appellants argue that the Bankruptcy Court "did not conclude that [Takacs, Bagley, and Jackson] received anything directly or indirectly as the result of the transfer of the [Fortune Transactions] from SPIB to HLSP Holdings" and that "[a]ny benefit [Takacs, Bagley, and Jackson] received was solely from the subsequent transfer to Fortune when Fortune delivered stock to HLSP Holdings pursuant to the Fortune Agreement." (*Id.* at 32.)

To the extent that Appellants argue that the phrase "entity for whose benefit the transfer was made" is limited to a debtor or guarantor (ECF No. 21 at 31 (citing *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988))), the Court is not persuaded.  As the Fourth Circuit has recognized, "nothing in the text of § 550(a)(1)

limits 'the entity for whose benefit' the transfer was made only to a debtor or guarantor and under some circumstances other persons will receive the benefit of a transfer from the bankrupt to a third party."  *In re Meredith*, 527 F.3d 372, 375–76 (4th Cir. 2008); *see also In re TOUSA, Inc.*, 680 F.3d 1298, 1313 (11th Cir. 2012) (acknowledging that while a guarantor "relationship may be the paradigmatic case, it is not the only circumstance that can give rise to 'for whose benefit' liability"); *In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987), *on reh'g,* 835 F.2d 584 (5th Cir. 1988) (recognizing that "the entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer"); *Boyer v. Belavilas*, 474 F.3d 375, 377 (7th Cir. 2007) (determining wife of debtor was "the entity for whose benefit" avoidable transfer was made when she diverted funds from custodial accounts for her children to a corporation she owned and controlled).

After reviewing the record, the Court cannot conclude that the Bankruptcy Court erred in its conclusion that Takacs, Bagley, and Jackson were the entities for whose benefit the transfer from HLSP Holdings to Fortune was made.  *See In re Flashcom, Inc.*, 647 F. App'x 689, 691 (9th Cir. 2016) (reviewing bankruptcy court's determining that party was "the entity for whose benefit" the transfer was made for clear error); *Boyer*, 474 F.3d at 377 (same).  As such, this portion of the Appellants' appeal is denied.

c. *Whether the Fortune Transactions Were Property*

The Appellants argue that the Bankruptcy Court failed to make any findings that the Fortune Transactions were "property" within the CUFTA.  (ECF No. 21 at 33.) Likewise, Takacs argues that the Bankruptcy Court failed to employ the proper legal standard in determining that the Fortune transactions were "property" within the CUFTA

and that, had it done so, the Bankruptcy Court would have "had to conclude that the transactions were not property that could be subject to a fraudulent-transfer action." (ECF No. 19 at 42.)  The Trustee argues that Takacs and the Appellants have waived these arguments because they failed to argue to the Bankruptcy Court that the Fortune Transactions were not property.  (ECF No. 30 at 12.)

In their replies, Takacs and the Appellants attempt to demonstrate that they did not waive this argument below.  (*See* ECF No. 51 at 16–17; ECF No. 52 at 39–48.) However, the Court is unpersuaded.

Takacs's contention that the determination that the Fortune Transactions were property under the CUFTA was the "Bankruptcy Court's *sua sponte* conclusion" is belied by the record.  After all, in the complaint in the adversary proceeding, the Trustee explicitly raised the argument that the transfers should be considered property.  (*See* Appellants' Appx at 36 ¶ 71 ("The Stone Pine Entities made various transfers of property and opportunities that either were or should have been the Debtor's property and should now be property of the bankruptcy estate.").)

After reviewing the parties' arguments and the citations to the record where they claim they argued below that the Fortune Transactions do not constitute property, the Court is not convinced that Takacs and the Appellants have properly preserved the argument for appeal.[4]  To the contrary, in the identified portions of the record, the parties appear to accept the notion that the Fortune Transactions are indeed property, and instead argue that the property did not belong to SPIB.  (*See* Appellants' App'x at 1213–20, 1252, 1562.)  Moreover, to the extent the parties hint at the argument in

---

[4] Nonetheless, the parties have preserved the argument that the Fortune transaction was not *SPIB's* property, and therefore the Court analyzes these arguments below.

passing, the Court concludes that they have failed to properly develop the argument below and have therefore forfeited the point.  *See Phillips*, 956 F.2d at 953–54.

Accordingly, this portion of Takacs and the Appellants' appeals is denied.

d.    *Whether the Opportunities Were SPIB's Property*

Takacs and the Appellants next argue that even if the Fortune Transactions could be considered "property," there is "no evidence supporting a finding that they were SPIB's property."  (ECF No. 21 at 34; ECF No. 19 at 49–52.)  They argue that the Bankruptcy Court neither held that SPIB held legal title nor equitable title to the Fortune Transactions under any standard recognized under Colorado law, including the doctrines for constructive trusts, resulting trusts, and/or equitable liens.  (ECF No. 21 at 35.)  Instead, they argue that the Bankruptcy Court erroneously determined property ownership by looking at the "substance and reality of a transaction," and argue that even if this test does apply, that the Bankruptcy Court's findings are "insufficient to support a reality in which SPIB owned the [Fortune Transactions]."  (*Id.* at 36–37.)  Among other things, the Appellants argue that the Bankruptcy Court failed to find that Takacs was SPIB's agent or had the authority to bind SPIB; that SPIB and Takacs were parties to any compensation arrangement for finding deals; that SPIB had any right to direct Takacs's development of the Fortune Transactions; or that SPIB could have realized the Fortune Transactions.  (*Id.* at 37–44.)

Takacs argues that Bankruptcy Court erred by applying a legal test for property ownership that "borrow[s] heavily from the 'corporate-opportunity' doctrine"; moreover, Takacs contends that if the Bankruptcy Court had applied the proper test, "it would have had to conclude that the transactions were not property that could be subject to a fraudulent-transfer action." (ECF No. 19 at 42.)  Takacs contends that SPIB had no

24

expectation in business opportunities generated by non-fiduciaries where SPIB did not deal in private equity asset management and lacked the financial capabilities to pursue the Fortune Transactions.  (*Id.* at 45–48.)

The Trustee responds that any invocation of an expectancy test is a "red herring" and emphasizes that equitable claims require a court to look at substance rather than form.  (ECF No. 30 at 15; ECF No. 31 at 20.)  Moreover, the Trustee argues that "[a]s a factual determination, the Bankruptcy Court made a correct determination that, since SPIB paid for the due diligence costs," the Fortune Transactions belonged to SPIB. (ECF No. 30 at 14; ECF No. 31 at 21–25.)  The Court agrees.

As another judge within the District of Colorado has recognized, "the CUFTA provides an 'equitable' remedy.  The purpose of a court sitting in equity is to promote and achieve justice with some degree of flexibility; in other words, the court is to examine substance over form."  *United States v. Wilhite*, 2016 WL 5720707, at *7 (D. Colo. Sept. 23, 2016), *aff'd,* 774 F. App'x 478 (10th Cir. 2019) (internal citations omitted); *see also Rocky Mountain Gold Mines v. Gold, Silver & Tungsten*, 93 P.2d 973, 982 (Colo. 1939) ("Equity . . . has to do with the substance and reality of a transaction – not the form and appearance which it may be made to assume . . . [I]t is the real intention of the parties, and the true nature of the transaction that concern equity; . . . no matter how many papers may have been executed that cover up the real purpose and give to the transaction an appearance other than the true one.").

To the extent that Takacs and the Appellants contend that the Bankruptcy Court erred by applying the "substance and reality of a transaction" test, the Court is unpersuaded.  Critically, neither Takacs nor the Appellants cite any case law supporting

the view that this test is inappropriate for determining equitable property ownership, nor is the Court aware of any such law.

Moreover, the Court cannot conclude that the Bankruptcy Court erred in its equitable determination that the Fortune Transactions belong to SPIB.  For example, the Court notes that that Bankruptcy Court had considered—and rejected—Takacs and the Appellants' arguments that Takacs developed the Fortune Transactions on his own, noting

> [j]ust as he had done with PEMG, and as part of his work as a Managing Director of the Stone Pine Companies, using a Stone Pine mailing and email address, Takacs identified business opportunities and presented them to Bagley so those opportunities could be realized, ideally with the help of Hamilton Lane (as in the case with PEMG).  The deals were obtained because the deal counterparties understood they were dealing with Stone Pine entities, and Stone Pine entities had a track record of success, including HLSP IB.  It was no accident the TechFund and Nomura letters of intent and the Fortune press releases specifically mentioned HLSP IB, and the entity formed to accomplish the deals was also named HLSP.  Having obtained business by a Stone Pine connection, the Defendants cannot now deny the Stone Pine connection.

(Appellants' App'x at 1284–85.)

Additionally, the Court finds the fact that SPIB paid development expenses for the Nomura, Moneda, and TechFund deals, and paid expenses for the Fortune sale, to be significant in determining that the Fortune Transactions belonged to SPIB.  For example, Bagley submitted an expense report for a trip he took to London June 8–20, 2005 as "SPIB mtg. in London with Nomura (Judith Tan) and Fortune" and charged the expenses to "SPIB – Fortune."  (*Id.* at 2907.)  He further represented on June 9 and 16, 2005, respectively, he entertained "Rene Mueller- Fortune and Jack Takacs – SPIB"

26

and "Jack Takacs – SPIB."  (*Id.*)

Finally, the Court notes that although Takacs and Appellants chose to use an "uncontaminated" company for the Fortune Transactions (*see* Appellants' App'x at 3058), Takacs and the Appellants nonetheless frequently invoked SPIB's name in pursuing the TechFund, Nomura, Moneda, and Fortune deals.  For example, Takacs, acting on behalf of "HLSP Hamilton Lane/Stone Pine,"[5] signed a Letter of Intent addressed to TechFund in which the description of HLSP states that "Stone Pine is a private equity investment firm and Hamilton Lane, a leading private equity advisor and gatekeeper that advises on $30bn in institutional capital earmarked for the private equity asset class."  (Appellants' App'x at 3054.)  Likewise, the draft letter of intent from Fortune was addressed to Takacs and Bagley at "The Stone Pine Investment Banking L.L.C." and stated that Fortune was proposing to "acquire 100% of the shares of Hamilton Lane / Stone Pine Investment Banking HLSP."  (Appellants' App'x at 2888.)

Accordingly, the Court cannot conclude that the Bankruptcy Court erred in determining that the Fortune Transactions were SPIB's property.  This portion of the appeals is also denied.

       e.    *Claims for Transfer of Fortune Transaction Were Not Time Barred*

Colorado Revised Statute § 38-8-105(1)(a) provides that

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

---

[5] As the Bankruptcy Court points out, there is no entity named "HLSP Hamilton Lane Stone Pine."  (Appellants' App'x at 1266.)

With regard to the fraudulent transfer claims brought under Colorado Revised Statute § 38-8-105(1)(a), the claim is "extinguished unless action is brought" "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  Colo. Rev. Stat. § 38-8-110(1)(a).  However, claims brought pursuant to Section 38-8-105(1)(a) are subject to equitable tolling.  *See United States v. Kwai Fun Wong*, 575 U.S. 402, 407–08 (2015) (recognizing that statutes of limitation are presumptively subject to equitable tolling); *Lewis v. Taylor*, 375 P.3d 1205 (Colo. 2016) (recognizing that statute of limitations for Colo. Rev. Stat. § 38-8-105(1)(a) can be tolled).

The Bankruptcy Court concluded that to the extent the Trustee's CUFTA claims were brought pursuant to section 38-8-105(1)(a), the "extent of tolling available depends on whether Trustee is proceeding under 11 U.S.C. § 544(a)[6], with the powers of a

---

[6] Under 11 U.S.C. § 544(a),

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--
>
> > (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
> >
> > (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

hypothetical creditor, or 11 U.S.C. § 544(b)[7], as an actual, unsecured creditor."
(Appellants' App'x at 1291.)

The Bankruptcy Court concluded the CUFTA claims were timely to the extent
they were brought under section 544(a) because the statute did not begin to run until
the beginning of the case; moreover, the Bankruptcy Court determined that the claims
should be subject to equitable tolling because "a hypothetical creditor could not have
discovered the fraudulent transfers prior to the bankruptcy filing because they were
concealed, and the Defendants participated in a wrongful scheme to evade discovery
obligations, delay the Texas State Court appeal, and delay the bankruptcy filing for the
specific purpose of avoiding the statute of limitations." (*Id*. at 1291–92.)

The Bankruptcy Court likewise determined that equitable tolling applies to the
CUFTA claims brought under section 544(b) such that it "extend[s] the statute of

> (3) a bona fide purchaser of real property, other than
> fixtures, from the debtor, against whom applicable law
> permits such transfer to be perfected, that obtains the
> status of a bona fide purchaser and has perfected such
> transfer at the time of the commencement of the case,
> whether or not such a purchaser exists.

[7] 11 U.S.C. § 550(b) provides:

> (1) Except as provided in paragraph (2), the trustee may avoid any
> transfer of an interest of the debtor in property or any obligation
> incurred by the debtor that is voidable under applicable law by a
> creditor holding an unsecured claim that is allowable
> under section 502 of this title or that is not allowable only
> under section 502(e) of this title.

> (2) Paragraph (1) shall not apply to a transfer of a charitable
> contribution (as that term is defined in section 548(d)(3)) that is
> not covered under section 548(a)(1)(B), by reason of section
> 548(a)(2). Any claim by any person to recover a transferred
> contribution described in the preceding sentence under Federal or
> State law in a Federal or State court shall be preempted by the
> commencement of the case.

limitations during the time ART was prevented from pursuing fraudulent transfers, due

to the decisions of the Texas State Court":

> [h]ere, the Texas State Court limited ART's fraudulent transfer claims to those occurring between September 16, 2002, and January 6, 2005, and also limited the jury's ability to find a fraudulent transfer, instructing the jury to consider the issue of fraudulent transfers only if the jury did not find Matisse to be the alter ego of SPIB.  Because the jury found Matisse to be the alter ego of SPIB, the jury did not decide whether fraudulent transfers were made.  ART preserved its rights to assert those issues by objecting at appropriate times and by pursing those issues on appeal, which appeal was still pending on the date Debtor's bankruptcy petition was filed.

(Appellants' App'x at 1293–94.)

Takacs and the Appellants argue that the Bankruptcy Court erred in holding that

the statute of limitations was equitably tolled because the Bankruptcy Court made no

finding that there was an extraordinary circumstance or that either Takacs or the

Appellants prevented ART or the Trustee from asserting its claim earlier.  (ECF No. 19

at 40; ECF No. 21 at 46–47.)  According to Takacs, "ART knew of its potential

fraudulent-transfer claim related to the Fortune Transactions well before the

limitations/repose period expired" and "[t]he fact that the Texas court will not allow the

claims to be added at the eleventh hour is irrelevant since nothing prevented ART from

filing a separate and timely action with respect to the Fortune Transactions."  (ECF No.

19 at 41; *see also* ECF No. 21 at 47.)

Takacs and Appellants argument that the Bankruptcy Court's equitable tolling

analysis was erroneous because it did not conclude there were extraordinary

circumstances is unavailing.  To the contrary, in *Dean Witter Reynolds, Inc. v. Hartman*,

911 P.2d 1094 (Colo. 1996) (en banc), the Supreme Court of Colorado recognized that

courts "appl[y] the doctrine of equitable tolling where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely matter" or in situations where "extraordinary circumstances make it impossible for the plaintiff to file his or her claims within the statutory period." *Id.* at 1096–97 (recognizing that the "reasoning underlying [the extraordinary circumstances cases] is that it is unfair to penalize the plaintiff for circumstances outside his or her control, so long as the plaintiff makes good faith efforts to pursue the claims when possible").[8] Here, the Bankruptcy Court concluded that equitable tolling is appropriate *both* because Defendants' conduct prevented a hypothetical creditor from discovering the fraudulent transfers prior to the bankruptcy filing *and* because ART actively pursued its claims to the fullest extent that it could.

The Court reviews the Bankruptcy Court's equitable determination on this matter for clear error and concludes the Bankruptcy Court's analysis was thorough and sound, and that there is no clear error on the face of the record. *See Devich v. United States*, 25 F.3d 1056 (10th Cir. 1994) (recognizing that applications of equitable doctrines to statutes of limitations are reviewed as factual determinations for clear error).

Accordingly, this portion of Takacs's and the Appellants' appeal is denied.[9]

### f.   *Intent to Hinder Transfers*

In determining whether a transfer was made with "actual intent to hinder, delay, or defraud any creditor of the debtor" pursuant to section 38-8-105(1)(a), courts may consider the following factors:

---

[8] The Appellants' citation to *Holland v. Florida*, 560 U.S. 631, 649 (2010) is likewise distinguishable because *Holland* is a federal habeas corpus case decided under federal law.

[9] Because the Court finds that equitable tolling applies, the Court need not address Takacs and the Appellants' other arguments regarding the statute of limitations.

    (a) The transfer or obligation was to an insider;

    (b) The debtor retained possession or control of the property transferred after the transfer;

    (c) The transfer or obligation was disclosed or concealed;

    (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (e) The transfer was of substantially all the debtor's assets;

    (f) The debtor absconded;

    (g) The debtor removed or concealed assets;

    (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

    (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Colo. Rev. Stat. § 38-8-105(2).

    The Bankruptcy Court analyzed each of the eleven factors, as well as contemporaneous documentation of the transfers and the parties' e-mails, in determining that Bagley, Takacs, and Jackson acted with fraudulent intent required for liability under section 38-8-105(1)(a).  (Appellants' App'x at 1287–89.)

    The Appellants argue that the Bankruptcy Court erred by "evaluat[ing] the 'badges of fraud' without regard to time, transaction or parties."  (ECF No. 21 at 52.)  As the Appellants concede, the Bankruptcy Court's intent findings are reviewed under a

clearly erroneous standard of review.  (*Id.* (citing *In re Stewart*, 2009 WL 3724977, at *2 (B.A.P. 10th Cir. 2009)).)  They contend that the Bankruptcy Court's findings are clearly erroneous because, *inter alia*:

- the Fortune transaction was publicized, not concealed, and the Bankruptcy Court did not explain what steps Defendants took to conceal the Fortune Transactions from creditors;

- the Bankruptcy Court did not find that ART had threatened any claim against SPIB or that Defendants believed ART would file suit against SPIB prior to the July 2006 lawsuit;

- although ART had a judgment against Matisse, ART did not assert a claim against SPIB until after the Fortune transaction;

- Bagley and Jackson voluntarily contributed funds into SPIB;

- the Trustee had no evidence that any loan to SPIB was ever changed in the books from a capital infusion to debt, and the Bankruptcy Court erred in recharacterizing loans to SPIB as capital contributions; and

- the transfers did not actually deplete SPIB's assets because neither the PEMG buyout proceeds nor the Fortune Transactions belonged to SPIB.

(ECF No. 21 at 53–59.)

The Court has fully considered all of the Appellants' arguments on the issue of intent to hinder transfers.  The Court finds that as to all of these arguments Appellants have failed to convincingly establish that the Bankruptcy Court's factual determinations and analysis with regard to the existence of the fraudulent intent required for liability under section 38-8-105(1)(a) were clearly erroneous.  As such, this portion of their

appeal is denied.

2.    PEMG-Payout Claims

With regard to the PEMG transactions, the Bankruptcy Court concluded as

follows:

> On May 23, 2006, PEMG paid HLSP IB the first $900,000.
> Rather than transfer those funds to SPIB as had been done
> in the past, Bagley and Jackson transferred the funds to
> themselves.  Bagley's family partnership, Princeton Partners,
> received $720,000, and Jackson received $180,000.  Each
> received property of SPIB as an initial transferee or as a
> mediate transferee not acting in good faith, and Bagley was
> the entity for whose benefit the transfer to Princeton Partners
> was made.  The Court will give each credit for the funds
> returned to SPIB, $720,000 from Princeton Partners and
> $144,000 from Jackson, although the funds should have
> been treated as SPIB income rather than as capital
> contributions.  The difference, $0 for Bagley and Princeton
> Partners and $36,000 from Jackson, is recoverable under
> § 550.

> On September 1, 2006, PEMG paid HLSP IB the remaining
> $900,000.  Princeton Partners received $712,000, and
> Jackson received $178,000.  Giving Bagley and Princeton
> Partners credit for $425,600 and Jackson credit for
> $142,400, the difference, $286,400 for Bagley and Princeton
> Partners and $35,600 for Jackson, is recoverable under
> § 550.  The Court will enter judgment in favor of Trustee for
> those amounts.

(Appellants' App'x at 1295.)

The Appellants argue that the Bankruptcy Court's determination regarding the

PEMG payout is erroneous for two reasons: (1) the claim is untimely; and (2) HLSP IB

was not owned by SPIB.  (ECF No. 21 at 27–28.)

a.    *Timeliness of PEMG-based Claims*

Under 11 U.S.C. § 546(a)(1),

> [a]n action or proceeding under section 544, 545, 547, 548,
> or 553 of this title may not be commenced after the earlier

34

of--

    (1) the later of--

        (A) 2 years after the entry of the order for relief; or

        (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A).

The Appellants contend that the PEMG payout claim is not timely under 11 U.S.C. § 546(a)(1)(A) because "PEMG does not appear in the Amended Complaint" and "[n]othing established that distribution of the PEMG Buyout proceeds arose out of any conduct, transaction, or occurrence set out or attempted to be set out in the Amended Complaint." (ECF No. 27 at 28.)  They further argue that "[t]he distribution of the PEMG Buyout proceeds occurred more than four years prior to the Petition Date" and that the claim is now extinguished under CUFTA § 108.  (*Id.*)

The Trustee responds that although the PEMG transaction was not explicitly named in the First Amended Complaint, the substance of the transaction was pled:

    34. From a review of the records and through discovery in other actions against the Debtor and its various affiliated entities, the Trustee has determined that the Individual Defendants denuded the assets of the Debtor and transferred such assets to themselves and other entities owned and controlled by them.  In addition to cash transfers, the Trustee believes that the Defendants caused the Debtor to pay them inflated and unreasonable consulting fees, to make improper and illegal loans to them, and to distribute assets to them under the guise of false and fraudulent expense reimbursements.  The Individual Defendants also caused the Debtor to pay certain of their individual tax liabilities with corporate funds.

(Appellants' Appendix at 52.)  Moreover, the Trustee argues that the claims were tried

by consent.  As the Bankruptcy Court determined:

> Rule 15 of the Federal Rules of Civil Procedure,
> incorporated in adversary proceedings by Fed. R. Bankr. P.
> 7015, permits amendment after trial to conform to the
> evidence particularly in cases where there is no surprise to
> the opposing party.  *New Mexico v. Dep't of Interior*, 854
> F.3d 1207, 1231 (10th Cir. 2017).  Here, the issues were
> discussed at both summary judgment and at trial, and
> evidence relating to the transfers was admitted by
> stipulation.  The Court finds no prejudice.  Amendment under
> Rule 15 should be 'liberally granted,' and the Court finds
> amendment appropriate in this case.

(Appellants' App'x at 1284 n.7.)

Here, notwithstanding the Appellants' arguments to the contrary, the Court finds

both that the substance of the PEMG claims was pled in the First Amended Complaint

and the claims were tried by consent.  Moreover, the amendments allowed by the

Bankruptcy Court relate back to the First Amended Complaint as a "claim or defense

that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Finally, for the reasons set

forth in Part III.A.1.E, the Court rejects the Appellants' argument that the PEMG claims

are barred pursuant to the applicable statute of limitations.

          b.    *Conclusion that PEMG Buyout Proceeds Should Have Gone to*
                *SPIB*

The Appellants contend that "[t]he sole basis for the Bankruptcy Court's

conclusion that the PEMG Buyout proceeds were SPIB's property was that SPIB owned

HLSP IB" even though "the parties had stipulated that HLSP IB was owned by Princeton

Partners and Jackson, not SPIB."  (ECF No. 21 at 27.)  As such, they argue that "the

avoidance of the transfer of the PEMB Buyout proceeds must be reversed for clear

error."  (ECF No. 21 at 27.)

In response, the Trustee cites *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018) for the proposition that "[e]ven though a court may not overlook stipulations as a matter of course, no rule of law requires a court to base the resolution of the case on stipulations of the parties."  (ECF No. 30 at 6.)

As the Bankruptcy Court recognized, when PEMG had previously paid HLSP IB, those payments were transferred to SPIB and recognized as SPIB income on its financial statements and tax returns.  (Appellants' App'x at 1284.)  Thereafter, when the parties negotiated a payout of the remainder of the PEMG contract, "Bagley and Jackson diverted the funds to themselves (in Bagley's case, to his family partnership Princeton Partners)."  (*Id.*)  The Court determined that "the funds paid to HLSP IB should have been transferred to SPIB and recognized as SPIB income, just as prior payments had been" and that "SPIB had a sufficient interest in the funds included in the PEMG payout that the transfers of the funds from HLSP IB to Princeton Partners and to Jackson should be considered transfers of SPIB funds."  (*Id.*)

While the Appellants attempt to make much out of the Bankruptcy Court's statement that the PEMG opportunity was "consummated through a SPIB-owned entity, HLSP IB," when in fact the parties had stipulated that HLSP IB was owned by Princeton Partners and Jackson, yet again the Court cannot conclude that these factual determinations of the Bankruptcy Court were clearly erroneous.  Among other things, the Appellants overlook the fact that Bagley wrote in an e-mail that "SPIB controls HLSP."  (Appellants' App'x at 1273.)

Moreover, contrary to the Appellants' conclusory assertion, it is far from evident that "[t]he sole basis for the Bankruptcy Court's conclusion that the PEMG Buyout

proceeds were SPIB's property was that SPIB owned HLSP IB."  (ECF No. 21 at 27.)
Instead, the Bankruptcy Court relied on the fact that: (1) the PEMG payouts were
treated differently from prior PEMG payments to HLSP IB; and (2) SPIB had previously
recognized the PEMG payments from HLSP IB as income on its own balance sheet and
tax returns.  (Appellants' App'x at 1284.)

Based on the foregoing, the Court concludes that Appellants have failed to
discharge their onerous burden of convincing the undersigned that the Bankruptcy
Court's determination that the PEMG payouts to Princeton Partners and Jackson
"should be considered transfers of SPIB funds" was clearly erroneous.  This portion of
the Appellants' appeal is therefore also denied.

3.    Amount of the Judgment

a.    *Value of the Fortune Transactions and Monetary Recovery*

The Bankruptcy Court held that SPIB transferred the Fortune Transactions to
HLSP Holdings for the benefit of Bagley, Jackson, and Takacs and entered judgment
pursuant to 11 U.S.C. § 550 based on the value of the Fortune stock transferred to
HLSP Holdings.  (Appellants' App'x at 1294.)  The Appellants raise three arguments
regarding the amount of the judgment.

First, Appellants argue that the Trustee failed to prove the value of the
transferred property under section 550(a).  (ECF No. 21 at 49.)  Because the purpose of
section 550 is to return the bankruptcy estate to its pre-transfer position, Appellants
contend that "SPIB's pre-transfer position would be before the closing of the Fortune
Agreement, not after the transfer of the [Fortune Transactions] and Fortune's delivery of
the stock to HLSP Holdings."  (*Id.* at 48–49.)  Moreover, the Appellants argue that the
"evidence did not support the value of SPIB's alleged property . . . was 100% of the

Fortune stock" and that the Trustee failed to prove that SPIB could have realized any value from the letters of intent.  (*Id.* at 49.)

Second, the Appellants contend that "[t]he Bankruptcy Court abused its discretion by entering a monetary judgment against Bagley and Jackson based on the value of the Fortune stock because Trustee failed to show any reason—let alone a 'compelling reason'—to depart from the default rule that property should be recovered." (*Id.* at 51.)

Third, the Appellants argue that the Bankruptcy Court erred in relying on Bagley's 2006 income tax valuation of unrestricted shares received from Fortune as evidence of the value of the restricted shares Bagley and Jackson received through HLSP Holdings. (*Id.* at 50.)

The Trustee responds that the Fortune Transactions "were sold to Fortune in exchange for publicly traded stock in Fortune" and that "[t]he value of the stock established the value of the transfer."  (ECF No. 30 at 29.)  It argues that "[t]he Bankruptcy Court had sufficient data to calculate damages and committed no error in doing so."  (*Id.*)

The Trustee further argues that the Appellants have waived their arguments regarding the value of the restricted stock and whether there was a "compelling" reason for the monetary judgment because they did not raise them below.  (ECF No. 30 at 30–31.)  Appellants neither contest this assertion in their reply nor identify any place in the record where they previously raised these arguments before the Bankruptcy Court. (*See generally* ECF No. 52.)  Given Appellants' failure to respond to the Trustee's argument with case law or citations to the record, the Court finds that Appellants have

waived these arguments and will not consider them further.

Moreover, the Court cannot conclude that the Bankruptcy Court erred in calculating the value of the Fortune Transactions.  Appellants' arguments that the SPIB's pre-transfer position is *before* the closing of the Fortune Agreement ignores the Bankruptcy Court's fundamental determination that the Fortune Transactions should have been SPIB's property.  As such, the Court finds that the Bankruptcy Court did not err by basing the judgment on the value of the Fortune stock transferred to HLSP Holdings.

This portion of the Appellants' appeal is therefore denied.

b.  *Cap of Judgment*

In its June 11, 2020 Order on Motion to Alter or Amend, the Bankruptcy Court denied Defendants' request that the judgment be capped at the total of the outstanding creditor claims, the administrative claims, and the Trustee's fees:

> Each Defendant's liability is based on his or its receipt of avoidable transfers, as required by 11 U.S.C. § 550.  In order to place an equitable limitation on Trustee's ability to collect any of the judgment amounts, the Court would need evidence as to the collectability of each judgment, the costs of collection, the amount of allowed claims of the estate, and the total amount of estate expenses, including attorney's fees that have not yet been sought, for services attorneys continue to provide, including appeals that have just been commenced and may take years to resolve.  At this time, no such evidence is available.  The Court cannot grant relief based on a hypothetical set of facts or circumstances.  At such time as the relevant amounts are certain or can reasonably be determined with certainty, no later than the time Trustee files his final report, the Court will entertain a motion regarding the treatment of any identified surplus.

(Appellants' App'x at 1444.)

Takacs and the Appellants argue that the Bankruptcy Court erred "when it

refused the defendants' request that the judgment be capped at the total of the outstanding creditor claims, the administrative claims and the trustee's fees."  (ECF No. 19 at 52; *see also* ECF No. 21 at 59–60.)  Takacs and Appellants cite *In re DSI Renal Holdings, LLC*, 2020 WL 550987 (Bankr. D. Del. Feb. 4, 2020) for the proposition that any recovery obtained by the Trustee must be limited to the total amount necessary to satisfy all allowed creditor claims in the Debtors' bankruptcy case.  Takacs further argues that "[w]hile quantifying what [the amounts of the claims] are might require further proceedings, the legal determination that a cap on damages focused on the amount of claims was ripe for consideration."  (ECF No. 19 at 53.)  As such, he requests that the Court reverse the Bankruptcy Court's order denying the defendants' motion to alter or amend the judgment and remand to the Bankruptcy Court to recalculate damages limited to the amount of any claims against the SPIB bankruptcy estate.  (*Id.* at 56.)

Critically, however, the Bankruptcy Court did not reject Takacs's and the Appellants' requests to limit the judgment outright.  To the contrary, it determined only that the request was merely *premature* before it received evidence as to "the collectability of each judgment, the costs of collection, the amount of allowed claims of the estate, and the total amount of estate expenses, including attorney's fees that have not yet been sought, for services attorneys continue to provide, including appeals that have just been commenced and may take years to resolve."  (Appellants' App'x at 1444.)  The parties have not presented the Court with any controlling case law finding that it was erroneous for the Bankruptcy Court to wait to adjudicate the treatment of any surplus until it had additional evidence, nor is the Court aware of any such case law.

As such, the Court cannot conclude that the Bankruptcy Court's denial of the Rule 9023 motion was erroneous. This portion of Takacs and the Appellants' appeal is denied.

**B.     Trustee's Cross Appeals (ECF Nos. 30 & 31)**

1.     <u>Waiver of Cap of the Judgment</u>

In the Order on Motion to Alter or Amend, the Bankruptcy Court rejected the Trustee's argument that Defendants' request to cap the bankruptcy judgment was "in the nature of an affirmative defense" and therefore concluded that Defendants did not waive "any right to object to treatment of any amount identified as 'surplus,' beyond that needed to pay allowed claims and expenses of the estate." (Appellants' App'x at 1444.) Citing *Racher v. Westlake Nursing Home Limited Partnership*, 871 F.3d 1152, 1163 (10th Cir. 2017) for the proposition that "damages cap[s] must be pled as an affirmative defense in federal court," the Trustee contends that the Bankruptcy Court abused its discretion in determining that Takacs and the Appellants had not waived any right to object to treatment of any amount identified as a "surplus." (ECF No. 31 at 45.)

Ultimately, however, the Trustee cites no binding case law supporting his argument that a request to cap a bankruptcy judgment is an affirmative defense that is waived if not pleaded, nor is the Court aware of any. As such, the Court cannot conclude that the Bankruptcy Court's determination that the Defendants had not waived the argument is erroneous. This portion of the Trustee's cross-appeal is therefore denied.

2.     <u>Breach of Fiduciary Duty Claim</u>

The Bankruptcy Court found that the 3-year statute of limitations, set forth in Colorado Revised Statutes § 13-80-101(1)(f), for the Trustee's breach of fiduciary

claims expired pre-petition.  (Appellants' App'x at 1298.)  The Bankruptcy Court further determined that the doctrine of adverse domination did not equitably toll the statute of limitations for the breach of fiduciary duty claims because: (1) it is not clear that the doctrine applies to limited liability companies (citing *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 888–89 (Bankr. C.D. Ill. 2017) (declining to apply the doctrine of adverse domination to an LLC)); and (2) even if the doctrine were applicable to LLCs, it was not applicable in this case where every member of the LLC participated in the transaction.  (*Id.*)

While the Trustee argues that the doctrine of adverse domination tolls the statute of limitations period for breach of fiduciary duty claims, he fails to cite any binding case law where the adverse domination doctrine was applied to a LLC, nor is the Court aware of any such law.[10]  As such, the Court cannot conclude that the Bankruptcy Court erred in determining that the adverse domination doctrine does not toll the statute of limitations applicable to the Trustee's claims for breach of fiduciary duty claims. Because the Court affirms the Bankruptcy Court's determination that the statute of limitations has expired, the Court need not address the parties' arguments regarding waiver.

Accordingly, this portion of the Trustee's cross-appeal is denied.

3.    Alter Ego and Corporate Veil Piercing

The Trustee argues that the Bankruptcy Court erred in finding that SPIB was not the alter-ego of Bagley and Jackson.  (ECF No. 30 at 48–58; ECF No. 31 at 35–45.)

---

[10] To the extent that the Trustee relies on cases applying the doctrine of adverse domination to corporations, such arguments are unavailing.  After all, Colorado courts recognize a clear distinction between LLCs and corporations.  *See Weinstein v. Colborne Foodbiotics, LLC*, 302 P.3d 263, 266 (Colo. 2013).

> Traditional piercing penetrates the corporate veil and imposes liability on individual shareholders for the obligations of the corporation.  Individual liability is appropriate when the corporation is merely the alter ego of the shareholder, and the corporate structure is used to perpetuate a wrong.  In such extraordinary circumstances, the courts may ignore the independent existence of the business entity and pierce the corporate veil to achieve an equitable result.

*In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (en banc) (internal citations omitted).

To prevail on a claim of alter-ego or veil-piercing, the Court must find by a preponderance of the evidence that: (1) the entity was a 'mere instrumentality' for carrying out the affairs of the alleged alter-ego; (2) the LLC form is used to perpetrate a wrong; and (3) disregarding the legal entity would achieve an equitable result.  *Boxer F2, L.P. v. Bronchick*, 722 F. App'x 791, 798 (10th Cir. 2018); Colo. Rev. Stat. § 7-80-107.

An alter ego relationship exists when the corporation is a "mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist."  *In re Phillips*, 139 P.3d at 644 (quoting *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004)).  In making this determination, a court takes into account the following factors: (1) whether the corporation is operated as a distinct business entity, (2) whether funds and assets are commingled, (3) whether adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) whether the business is thinly capitalized, (6) whether the corporation is used as a 'mere shell,' (7) whether shareholders disregard legal formalities, and (8) whether corporate funds or assets are used for noncorporate

purposes.  *Id.*

The Bankruptcy Court did not find that HLSP IB, HLPEF/SP Management, and ANSM were alter egos of each other or SPIB.  (Appellants' App'x at 1300.)  Specifically, the Bankruptcy Court determined:

> Here, the Court finds each of the three Stone Pine entity Defendants was operated as a distinct business entity, with the three different Defendants involved in separate business deals, having separate income streams, and separate investors.  While funds were transferred back and forth between the Defendants and SPIB, the Court cannot find the companies' assets commingled.  Funds were tracked separately, with detailed records maintained by SPAS.  The Court does not find Bagley or the other individual Defendants misused the corporate form of HLSP IB, HLPEF/SP Management, or ANSM.  The entities were not thinly capitalized, and the Court cannot find them to be mere shells.  It is not clear their corporate formalities were ignored, and the Court cannot find their assets were used for non-corporate purposes.

(*Id.*)

The Trustee speculates that "the Bankruptcy Court made a determination on the issue of equity as it relates to the imposition of alter-ego in favor of all the Defendants based upon the Bankruptcy Court's belief that the Trustee's right to relief for avoidance of fraudulent transfers was 'more appropriate' than an equitable alter-ego finding" and contends that "the Bankruptcy Court then didn't analyze the underlying factual record that supported the CUFTA claims for its applicability to the issues to be addressed under alter-ego."  (ECF No. 31 at 36–37.)

According to the Trustee, "the evidence conclusively establishes through the Defendants' testimony and their contemporaneous email correspondence and communications their desire to avoid liability to ART and after the unfavorable alter-ego

outcome in the Texas State Court litigation, to use SPIB as a pawn in a game of delay and litigation strategies." (*Id.* at 41.)  Moreover, the Trustee argues that Bagley and Takacs siphoned off millions in profits from the Fortune transaction while causing SPIB to pay their personal expenses.  (*Id.* at 43–44.)

While a close call, and while the Court may have concluded to the contrary were it presented with this issue in the first instance, on this record the Court cannot conclude on appeal that the Bankruptcy Court's factual determinations on this issue were clearly erroneous, or that the Bankruptcy Court's equitable determinations constituted an abuse of discretion.  Among other things, the Court agrees with the Bankruptcy Court's conclusion that although Bagley, Takacs, and Jackson participated in a scheme to transfer SPIB's assets to other entities and to themselves, those transfers do not rise to the level of ignoring the corporate existence of each entity.  Likewise, Bagley, Takacs, and Jackson appropriately used the corporate form for the original contract between ART and Matisse and SPAS continued to maintain adequate corporate records on SPIB's behalf.

These portions of the Trustee's cross appeals are therefore also denied.

**C.    Motion to Strike Appendix Entry**

In the Motion to Strike Appendix Entry, Appellants and Takacs move to strike pages 4825–4848 of the Trustee's appendix from the record, which include the text of the findings of fact made by the Bankruptcy Court with citations to the record added by the Trustee.  (ECF No. 46.)

Ultimately, because pages 4825–4848 of the Trustee's appendix were not before the Bankruptcy Court at the time of its decision, the Court grants the motion and notes that it has not relied on this portion of the appendix in resolving the parties'

appeals.  *See In re Jester*, 2015 WL 6389290, at *11, n.83 (B.A.P. 10th Cir. Oct. 22,

2015) (granting motion to strike certain documents not before bankruptcy court at the

time of its decision); *Adams v. Royal Indem. Co.,* 99 F.3d 964, 967 n.3 (10th Cir.

1996) (court should strike documents in appendix not presented to trial court); *Aero–*

*Med., Inc. v. United States,* 23 F.3d 328, 329 n.2 (10th Cir. 1994) (court should strike

documents in appendix not presented to trial court).

**D.     Motion to Strike Cross-Appeal**

  In the Motion to Strike Cross-Appeal**,** Takacs asks the Court to strike the

Trustee's cross-appeal from the Bankruptcy Court's Order on Motion to Alter or Amend.

(ECF No. 15.)  He argues that taking the cross-appeal was "neither necessary nor

appropriate" because the Trustee is not aggrieved by the June 5, 2020 order.  (*Id.* at 3

(citing *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1290 (10th Cir.

2006)).)

  However, because the Court affirms the portions of the Bankruptcy Court's order

on the issues that are the subject of the Trustee's Cross-Appeal, it need not decide

whether the cross-appeal was necessary or appropriate.  Accordingly, the Motion to

Strike Cross-Appeal is denied as moot.

## IV. CONCLUSION

  For the reasons set forth above, the Court ORDERS as follows:

1. The judgment of the Bankruptcy Court is AFFIRMED in its entirety;

2. The Motion to Strike Appellee's Cross-Appeal from Bankruptcy Court's June 5,

  2020 Order (ECF No. 15) is DENIED as MOOT;

3. The Motion to Strike Appellee's Appendix Entry (ECF No. 46) is GRANTED;

4.      The Clerk shall enter judgment in favor of Appellee and against Appellants, and

shall terminate this case; and

5.      Appellee shall have his costs incurred in this Court, if any, upon compliance with

D.C.COLO.LCivR 54.1.

Dated this 17th day of November, 2021.

BY THE COURT:

William J. Martinez
United States District Judge